EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Daniel Cruz Rosario<br><br>Recurrido | Certiorari<br><br>2020 TSPR 90<br><br>204 DPR ____ |

Número del Caso: CC-2020-250


Fecha: 25 de agosto de 2020


Tribunal de Apelaciones:

    Panel III


Oficina del Procurador General

    Lcdo. Pedro A. Vázquez Montijo
    Subprocurador General


Abogados de la parte Recurrida:

    Lcda. Frances Lorena Ruiz Lourido
    Lcdo. Efraín A. Ruiz Ruiz


Materia: Derecho Constitucional y Procesal Penal – La Cláusula de Confrontación, contenida en la Sexta Enmienda de la Constitución de los Estados Unidos y en la Sección 11 de la Carta de Derechos de la Constitución de Puerto Rico, no prohíbe que un testigo declare en el juicio usando una mascarilla como medida de prevención de la propagación del COVID-19. Los tribunales pueden establecer medidas cautelares de prevención para lograr un balance entre el derecho del acusado de confrontar a los testigos de cargo y el interés general en proteger a los testigos y demás participantes de los procesos judiciales de un potencial contagio del virus.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Daniel Cruz Rosario<br><br>Recurrido | CC-2020-250 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco

En San Juan, Puerto Rico, a 25 de agosto de 2020.

Actualmente atravesamos por una crisis de salud mundial cuya culminación es incierta. La pandemia de enfermedad por coronavirus (en adelante, "COVID-19" o "pandemia") cobró la primera vida en Puerto Rico a mediados de marzo de 2020 y, al día de hoy, vivimos uno de los momentos de mayor contagio. Basta con examinar las estadísticas de la Organización Mundial de la Salud (WHO, por sus siglas en inglés) y las del Departamento de Salud de Puerto Rico para reconocer la gravedad del asunto. En Puerto Rico el número de infectados y fallecidos ha incrementado exponencialmente y agosto de 2020 se pronostica como el mes con mayores contagios.[1]

---

[1] *Puerto Rico: WHO Coronavirus Disease (COVID-19) Dashboard*, https://covid19.who.int/region/amro/country/pr (última visita 24 de agosto de 2020); M. Valencia-Prado y J. Becerra, *Crecimiento Exponencial de los Contagios Covid-19*, Departamento de Salud de Puerto

Lamentablemente los tratamientos para combatir el virus aún se encuentran en las primeras etapas de investigación y desarrollo.[2]

Partiendo de esta realidad, la controversia ante nos permite examinar si la Cláusula de Confrontación, contenida en la Sexta Enmienda de la Constitución de los Estados Unidos, *infra*, y en la Sección 11 de la Carta de Derechos de la Constitución de Puerto Rico, *infra*, prohíbe categóricamente que un testigo declare en el Juicio usando una mascarilla como medida de prevención de la propagación del COVID-19. Asimismo, nos brinda la oportunidad de expresarnos sobre las medidas cautelares de prevención que pueden establecer los tribunales, de manera que se logre un balance entre el interés del acusado de confrontar a los testigos de cargo y el interés general en proteger a los testigos y demás participantes de los procesos judiciales de un potencial contagio del virus.

Adelantamos que bajo los parámetros constitucionales que impone el Derecho a la Confrontación, en el contexto actual de la pandemia, el uso de una mascarilla protectora por parte de un testigo no infringe este derecho.

Pasemos a delinear los antecedentes fácticos que generaron la controversia de autos.

I

---

Rico, 13 de julio de 2020, http://www.salud.gov.pr/Documents/Crecimiento%20Exponencial%20de%20los%20Contagios%20COVID-19.pdf (última visita 24 de agosto de 2020).

[2] J. Corum *et al.*, *Tratamientos y medicamentos para el coronavirus: monitoreo de efectividad*, New York Times, 21 de agosto de 2020, https://www.nytimes.com/es/interactive/2020/science/coronavirus-tratamientos-curas.html (última visita 24 de agosto de 2020).

El 16 de junio de 2020, el Tribunal de Primera Instancia emitió una Resolución mediante la cual señaló la Vista del Juicio para atender un cargo menos grave en contra del Sr. Daniel Cruz Rosario (en adelante, "el recurrido"). El foro de instancia promovió el uso del sistema de videoconferencias de la Rama Judicial para la celebración de la Vista. Sin embargo, el recurrido se opuso y solicitó que el Juicio se celebrara presencialmente. Además, peticionó que no se les permitiera a los testigos declarar con mascarillas protectoras dado que esto vulneraba su derecho de confrontar a los testigos de cargo y que tal derecho acarrea el que estos declaren sin ningún objeto en la cara. Basó su argumento en que la mascarilla afecta la apreciación del comportamiento de los testigos.

Luego de que el Tribunal de Primera Instancia declaró no ha lugar la Moción presentada por el recurrido, este acudió al Tribunal de Apelaciones. El 3 de julio de 2020 el foro apelativo intermedio emitió una Sentencia revocatoria. Arguyó que el Derecho a la Confrontación comprende la observación del comportamiento del testigo y que el uso de mascarillas impide al juzgador de hechos contar con todos los elementos necesarios para otorgarle credibilidad más certera al testigo. Asimismo, expresó que la mascarilla no permitía al abogado de Defensa invocar los señalamientos correspondientes en torno al comportamiento del declarante ya que la mascarilla oculta sus gestos, expresiones faciales y pudiera alterar el tono

de su voz. Concluyó que procedía la celebración del Juicio presencialmente y sin que los testigos usen mascarillas protectoras.[3]

Así las cosas, el 29 de julio de 2020 el Ministerio Público (en adelante, "el peticionario") presentó ante nos un recurso de *Certiorari* y le acompañó una Moción en Auxilio de Jurisdicción. El peticionario señaló el error siguiente:

> El Tribunal de Apelaciones erró al revocar al Tribunal de Primera Instancia y al sostener que los testigos deben declarar sin mascarillas -aun cuando las instrucciones médicas y gubernamentales son su utilización de forma obligatoria debido a la pandemia-, fundamentado en que supuestamente con ella se coartan derechos constitucionales del acusado. De esta forma no validó el interés apremiante del Estado en mantener y preservar la salud de todos los ciudadanos y no catalogó la mascarilla como una herramienta importante para atender ese referido interés.

El 31 de julio de 2020, declaramos ha lugar la referida Moción y expedimos el recurso solicitado.

Contando con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

II

A.

La Sexta Enmienda de la Constitución de los Estados Unidos reconoce el Derecho a la Confrontación en los procesos criminales. Enmda. VI, Const. EE. UU., LPRA, Tomo 1. Asimismo, la Sección 11 del Artículo II de la Constitución de Puerto Rico consagra el derecho de todo

---

[3] El Panel fue integrado por los Jueces Vizcarrondo Irizarry, Rivera Colón y Adames Soto. El Juez Adames Soto disintió.

acusado a "carearse con los testigos de cargo". Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. Estas disposiciones son conocidas como la Cláusula de Confrontación.

La Clausula de Confrontación recoge el principio fundamental de que se ponga al acusado en posición de enfrentar a sus acusadores. *Pointer v. Texas*, 380 US 400, 405 (1965). Este principio está vinculado con el debido proceso de ley dado que los acusados deben tener la oportunidad para defenderse de las acusaciones del Estado. *Íd.*, pág. 405.

El derecho constitucional de enfrentarse a los testigos de cargo opera en la etapa del Juicio. *Pueblo v. Rodríguez Aponte*, 116 DPR 653, 660 (1985) ("nuestra Constitución establece en la etapa del juicio el derecho de todo acusado a carearse con los testigos de cargo"); *Barber v. Page*, 390 US 719, 725 (1968) ("The right to confrontation is basically a trial right"). El mal que intenta evitar el Derecho a la Confrontación es que se utilicen declaraciones *ex parte* y deposiciones en el enjuiciamiento del acusado en vez del interrogatorio y el contrainterrogatorio de los testigos. *Pueblo v. Ríos Nogueras*, 114 DPR 256, 262 (1983); *Mattox v. United States*, 156 US 237, 242 (1895). Cuando se aprobó la Constitución de Puerto Rico se reconoció que "[l]a garantía de confrontarse con los testigos contrarios es esencial en el sistema nuestro. [...] El propósito es impedir que se utilicen en contra de un acusado declaraciones que no se han sometido a la prueba del

contrainterrogatorio". *Pueblo v. Vargas*, 74 DPR 144, 151 (1952). Es indudable que exigirle al testigo enfrentarse al acusado en el Juicio le atribuye un mayor grado de seriedad al proceso penal y fomenta el sistema adversativo ya que el testigo relata los hechos frente a la persona que se verá afectada por sus declaraciones. Al confrontarse con los testigos, el acusado puede poner a prueba las versiones que estos ofrezcan sobre los hechos y exponer posibles contradicciones. También permite que el juzgador de hechos pueda observar a los testigos y determinar si su testimonio merece credibilidad.

El Derecho a la Confrontación fundamentalmente tiene tres (3) vertientes procesales: (1) derecho al careo o confrontación cara a cara con los testigos adversos; (2) derecho a contrainterrogar, y (3) derecho a excluir la prueba de referencia que intente presentar el Ministerio Público. *Pueblo v. Pérez Santos*, 195 DPR 262, 269-270 (2016). Aunque solapan, no hay congruencia total entre las vertientes señaladas. Se tratan pues, de protecciones distintas sobre el mencionado derecho.

La primera vertiente exige que los testigos declaren frente al acusado. El derecho al careo "es la confrontación con los testigos de cargo en presencia del tribunal". D. Nevares-Muñiz, *Sumario de Derecho Procesal Penal Puertorriqueño*, 10ma ed. rev., Puerto Rico, Ed. Instituto para el Desarrollo del Derecho, 2014, pág. 243. Según la Real Academia Española, el término "carear", cuando se refiere a dos personas, significa "[p]onerse

resueltamente cara a cara a fin de resolver algún asunto desagradable para cualquiera de ellas". Real Academia Española, *Diccionario de la Lengua Española*, 23a ed. (2014). Por tal motivo, las controversias que se originan en esta vertiente se relacionan a situaciones en las que se limita la interacción frente a frente con el testigo que declara en el Juicio.

Por su parte, la segunda vertiente se enfoca en el derecho que tiene el acusado para contrainterrogar al testigo. Generalmente hay gran liberalidad en este cuestionamiento, siempre y cuando estén dentro del alcance del interrogatorio directo. Las controversias que surgen en esta vertiente tratan sobre las limitaciones que impone el tribunal a las preguntas que pueden hacerse en el contrainterrogatorio y las situaciones en las que este resulta limitado por la incapacidad del testigo para recordar o por su negativa a contestar. E.L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Adjudicativa*, San Juan, Ed. Situm, 2018, págs. 63-79.

Por último, destacamos que la tercera vertiente ha sido la que más casuística ha generado.[4] Se trata de declaraciones hechas fuera del Juicio que el Ministerio Público intenta presentar como evidencia sustantiva en contra de un acusado. Por virtud de la Cláusula de Confrontación se excluye cierta prueba de referencia que de lo contrario sería admisible bajo las Reglas de

---

[4] *Pueblo v. Pérez Santos*, 195 DPR 262 (2016); *Pueblo v. Santos Santos*, 185 DPR 709 (2012); *Pueblo v. Guerrido López*, 179 DPR 950 (2010); *Pueblo v. Stevenson Colón*, 113 DPR 634 (1982); *Pueblo v. Esteves Rosado*, 110 DPR 334 (1980).

Evidencia. El estándar para atender estas controversias se instauró en los Estados Unidos en el caso de *Crawford v. Washington*, 541 US 36 (2004) y en Puerto Rico en el caso de *Pueblo v. Guerrido López*, 179 DPR 950 (2010).

Así pues, la Cláusula de Confrontación se activa ante dos tipos de declaraciones: (1) las que se hacen en el Juicio y (2) las que se hacen fuera del Juicio y son de carácter testimonial.[5] En cuanto a los testigos que declaran en el Juicio, la Cláusula de Confrontación le garantiza al acusado que esos testigos declaren frente a él (primera vertiente) y que tenga la oportunidad de llevar a cabo un interrogatorio efectivo (segunda vertiente). *A contrario sensu*, en cuanto a las personas que no testifican en el Juicio y se presentan sus declaraciones testimoniales como prueba de cargo, la Cláusula de Confrontación le garantiza al acusado que estas serán excluidas (tercera vertiente) si no cumplen con (1) la no disponibilidad del declarante para testificar en el Juicio, y (2) que previamente se hubiera

---

[5] Las declaraciones "testimoniales" son aquellas que tienen como propósito crear un expediente para Juicio o que intentan servir como un sustituto extrajudicial de lo que sería un testimonio en corte. *Pueblo v. Santos Santos*, supra, pág. 723. Son testimoniales, por ejemplo, las declaraciones siguientes:

> [D]eclaraciones en un testimonio *ex-parte* vertido durante un juicio, *affidavits*, interrogatorios bajo custodia, testimonios anteriores en los cuales el acusado no haya tenido la oportunidad de contrainterrogar, declaraciones vertidas antes del juicio en circunstancias que el declarante razonablemente pudiera esperar que fueran usadas por el Ministerio Público, declaraciones extrajudiciales como *affidavits*, deposiciones, testimonios anteriores y declaraciones hechas en circunstancias que razonablemente pudieran llevar a un testigo objetivo a creer que tal declaración pudiera estar disponible para utilizarse en un juicio posterior. *Pueblo v. Guerrido López*, supra, págs. 968-969.

tenido la oportunidad de contrainterrogarlo con relación a las declaraciones que se presentan como prueba.

En lo relativo a la primera vertiente, no hemos abordado en ella directamente. Las breves menciones que se han hecho en nuestra jurisprudencia sobre la confrontación cara a cara han ocurrido en contenciones relacionadas a las otra dos (2) vertientes. Incluso, se ha expresado que "—el derecho del acusado a que los testigos en su contra testifiquen en el juicio frente a él, en su cara— est[á] un tanto rezagad[o], ante la primacía de la dimensión del derecho a contrainterrogar a los testigos de cargo". Chiesa Aponte, *op. cit.*, pág. 80. De esta forma, el asunto ante nos permite profundizar sobre un aspecto del Derecho a la Confrontación que no hemos singularizado en detalle. Esto, porque la disputa no versa sobre la exclusión de prueba de referencia o sobre limitaciones al alcance del contrainterrogatorio, sino que está dirigida a la limitación del derecho a la confrontación cara a cara en el Juicio.

B.

En vista de que es la primera ocasión en la cual examinamos las limitaciones que lícitamente pueden imponerse al derecho de confrontación cara a cara, es menester analizar los pronunciamientos del Tribunal Supremo de Estados Unidos sobre este particular. Los casos seminales son *Coy v. Iowa*, 487 US 1012 (1988) y *Maryland v. Craig*, 497 US 836 (1990).

En *Coy v. Iowa*, supra, se le imputó al acusado haber agredido sexualmente a dos niñas. Un estatuto de Iowa permitía que en casos de delitos sexuales los testimonios de denunciantes menores de edad se ofrecieran a través de un circuito cerrado de televisión o detrás de un biombo (*screen*). A petición del Ministerio Público, el tribunal de instancia aprobó el uso de un biombo grande que fue colocado entre el acusado y el podio de testigos mientras testificaron las niñas. El biombo permitía al acusado percibir tenuemente a las testigos, pero las testigos no lo veían en lo absoluto. El acusado se opuso al uso del biombo, basándose en su derecho al careo con las testigos. Luego de ser hallado culpable, el acusado apeló y eventualmente el Tribunal Supremo de Iowa confirmó su condena. El Tribunal rechazó el argumento de que se violentó su derecho de confrontar a las testigos dado que la capacidad de interrogarlas no fue afectada por el biombo.

Posteriormente, el Tribunal Supremo Federal revocó la condena del acusado tras concluir que el uso del biombo violentó la Cláusula de Confrontación. Al así resolver, dejó para otra ocasión el examen de si existen excepciones al derecho de confrontarse cara a cara con los testigos que declaran en el Juicio. Enfatizó que fueran cuales fuesen esas excepciones, seguramente solo se permitirían en circunstancias necesarias para promover una política pública importante. Rechazó que el estatuto promulgado por el Estado satisfacía el requisito y adelantó que se

necesitaba algo más que una presunción generalizada mediante legislación.

Dos (2) años más tarde el Tribunal Supremo de Estados Unidos fue puesto en posición para reconocer tal excepción. En *Maryland v. Craig*, supra, se le imputó a la acusada haber abusado de una niña. El Ministerio Público invocó un procedimiento provisto mediante legislación estatal que permitía que el juzgador de hechos recibiera el testimonio de un niño, que presuntamente era víctima de abuso infantil, mediante circuito cerrado de televisión. Para que se aprobara ese mecanismo, el juez debía realizar una vista de necesidad para confirmar que testificar le causaría serio disturbio emocional al niño y le impediría declarar adecuadamente. La acusada se opuso por motivos de la Cláusula de Confrontación, pero no prosperó en su planteamiento y eventualmente fue hallada culpable. Esta apeló y el foro apelativo estatal revocó su condena por interpretar que *Coy v. Iowa*, supra, impedía el uso del mecanismo promulgado por la ley estatal.

Por su parte, el máxime intérprete judicial a nivel federal revocó al foro apelativo y reinstaló la condena de la acusada. Concluyó que el interés estatal en el bienestar físico y psicológico de las víctimas de abuso infantil puede ser lo suficientemente importante como para superar, al menos en algunos casos, el derecho del acusado a carearse con sus acusadores en el Juicio. Debido a que en ese caso el foro de instancia llevó a cabo una vista de necesidad para determinar el riesgo individualizado que

sufriría la niña testigo, el Tribunal se dio a la tarea de responder la pregunta que se había reservado en *Coy v. Iowa*, supra.

El Tribunal resaltó que la preocupación central de la Cláusula de Confrontación es garantizar la confiabilidad de la evidencia presentada en contra de un acusado, sometiéndola a un examen riguroso y adversativo ante el juzgador de hechos. *Maryland v. Craig*, supra, pág. 845. En consecuencia, el Derecho a la Confrontación no solo abarca el examen personal cara a cara con el testigo en el Juicio, sino también que el testigo declare bajo juramento, sea sometido a contrainterrogatorio y que se le permita al juzgador de hechos observar el comportamiento del testigo al hacer su declaración. Por lo cual, razonó que "[t]he combined effect of these elements of confrontation —physical presence, oath, cross-examination, and observation of demeanor by the trier of fact— serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings". *Íd.*, pág. 846.

Culminó expresando que, aunque la Cláusula de Confrontación refleja una preferencia por la confrontación cara a cara en el Juicio, tal preferencia ocasionalmente debe ceder ante consideraciones de política pública y las necesidades del caso. Por lo tanto, aunque reafirmó la importancia de la confrontación cara a cara con los

testigos de cargo, resolvió que la presencia física no debe valorarse como un elemento indispensable. Mencionó que generalmente la Cláusula de Confrontación se satisface cuando, a través del contrainterrogatorio, la Defensa tiene una oportunidad completa y justa de investigar y exponer debilidades en el testimonio de modo que pueda alertarse al juzgador de hechos sobre el peso que deba darle al testimonio. *Íd.*, pág. 847.

Influyó en la decisión del Foro Supremo Federal el que, a pesar de que se trataba de una transmisión unidireccional, se preservaron los demás elementos del careo: la niña testificó bajo juramento, la acusada tuvo la oportunidad de contrainterrogarla y se podía observar mediante el monitor de video el comportamiento de la testigo mientras declaraba. Por tanto, aunque la confrontación no fue cara a cara con la acusada, la presencia de estos otros elementos aseguró adecuadamente que el testimonio fuese confiable.

Encontramos persuasivo el estándar establecido por el Tribunal Supremo de Estados Unidos en *Maryland v. Craig*, supra, para evaluar las limitaciones al Derecho de Confrontación en las situaciones en que el testigo está disponible y declara durante el Juicio. Tal razonamiento es cónsono con nuestra Constitución y con las expresiones que hemos realizado en otros casos. Consecuentemente, adoptamos este estándar en nuestra jurisdicción.

Ahora bien, notamos que aunque las tres (3) vertientes del Derecho a la Confrontación reseñadas en el

acápite anterior son distinguibles entre sí, existe una intersección entre ellas y esta ocurre en el derecho a contrainterrogar. Es decir, el derecho a contrainterrogar es una consideración *sine qua non* para todas las controversias sobre la Cláusula de Confrontación; sean controversias sobre la confrontación cara a cara, sobre admisibilidad de declaraciones testimoniales que son prueba de referencia o, por supuesto, sobre limitaciones impuestas al contrainterrogatorio que puede realizar el acusado.

En concordancia con lo anterior, hemos expresado que "lo crucial en relación con el derecho a la confrontación es que la defensa tenga la oportunidad de contrainterrogar". *Pueblo v. Stevenson Colón*, 113 DPR 634, 639-640 (1982). De igual forma, hemos esbozado que la Cláusula de Confrontación puede satisfacerse sin la presencia física del testigo en el Juicio siempre que se le hubiera provisto al acusado la oportunidad de contrainterrogarlo previamente:

> **La confrontación que garantizan la Sexta Enmienda y el Art. II, Sec. II de nuestra Constitución se cumple con la oportunidad de contrainterrogar, sin que sea indispensable la presencia del acusado. No está irremisiblemente atada al encuentro físico, al enfrentamiento nariz con nariz entre testigo y acusado,** que en términos de depuración del testimonio no es ni sombra del eficaz escrutinio, del potencial de descubrimiento de la verdad que es el objetivo constitucional y esencia del contrainterrogatorio formulado por el abogado defensor. **'El principal y esencial propósito de la confrontación es asegurar al oponente la oportunidad de contrainterrogar. El adversario exige confrontación, no con el vano propósito de mirar el testigo, o para que éste los mire a él,**

> **sino con el propósito de contrainterrogatorio que sólo se logra mediante la directa formulación de preguntas y la obtención de respuestas inmediatas.'** (Énfasis suplido). (Cita omitida). *Pueblo v. Ruiz Lebrón*, 111 DPR 435, 442 (1981).

Similarmente, en años recientes hemos reconocido que el Derecho a la Confrontación se mide bajo el crisol del contrainterrogatorio:

> [**L**]**a meta de la Cláusula de Confrontación de la Sexta Enmienda es asegurar la confiabilidad (reliability) de la evidencia que se presenta contra un acusado.** Pero, cuando esa evidencia es testimonial, esa meta, más que sustantiva, es una garantía procesal. **En ese sentido, el Tribunal Supremo federal señala, con relación a esa garantía: [i]t commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.**" (Énfasis suplido). *Pueblo v. Guerrido López*, supra, pág. 967.

Aunque el contrainterrogatorio de los testigos en el Juicio no es sinónimo del Derecho a la Confrontación, lo cierto es que "el central o núcleo del derecho, es el derecho del acusado a contrainterrogar a los testigos en su contra". E.L. Chiesa Aponte, *Derecho Procesal Penal*, 81 Rev. Jur UPR 373, 381 (2012).

Tomando esto en cuenta, pautamos que, bajo el estándar de *Maryland v. Craig*, supra, le daremos preeminencia al elemento del contrainterrogatorio al sopesar la confiabilidad del testimonio ofrecido en el Juicio. Así, establecemos que aunque el derecho a carearse con los testigos de cargo puede limitarse siempre que la convergencia de los elementos mencionados anteriormente demuestren la confiabilidad del testimonio, la limitación no debe repercutir nocivamente en el elemento del

contrainterrogatorio. La oportunidad de conducir un contrainterrogatorio efectivo contra el testigo es imprescindible para que se dé cumplimento a la Cláusula de Confrontación.[6] Por lo tanto, el balance que se haga de los elementos no debe tornar el derecho a contrainterrogar en un ejercicio *pro forma*.

De este modo, para verificar que las limitaciones impuestas al derecho a carearse con los testigos de cargo en el Juicio no violentan la Cláusula de Confrontación, aplicaremos el estándar siguiente: (1) que se adelante una política pública importante, y (2) que se asegure la confiabilidad del testimonio. Una vez establecida, de manera particularizada, la política pública importante que justifica la limitación del Derecho a la Confrontación y se identifica la medida que debe implantarse para adelantarla, entonces se continúa al siguiente criterio. Para asegurar la confiabilidad del testimonio ofrecido en el Juicio, se tomarán en cuenta los elementos siguientes: (1) la presencia física; (2) el testimonio bajo juramento; (3) la oportunidad de contrainterrogar, y (4) la oportunidad de evaluar el comportamiento del testigo. De los anteriores elementos, el único que es imprescindible es la oportunidad de conducir un contrainterrogatorio efectivo. En cuanto a los demás, se hará una evaluación caso a caso del menoscabo que experimenta el Derecho a la Confrontación para determinar si el **efecto combinado** de

---

[6] El derecho lo que garantiza es la *oportunidad* de un contrainterrogatorio efectivo, no que será efectivo *per se*. *Delaware v. Fensterer*, 474 US 15, 20 (1985).

los restantes elementos constituye suficiente salvaguarda para asegurar la confiabilidad del testimonio. De contestarse esto último en la afirmativa, se satisface la Cláusula de Confrontación. *A contrario sensu*, si se contesta en la negativa, se violentaría la Cláusula.

C.

Antes de aplicar el estándar a la controversia de autos, nos concentramos en profundizar sobre el elemento del derecho al careo que nos compete en este momento: el comportamiento (*demeanor*) del testigo.

El *demeanor* se refiere a la conducta no verbal que exterioriza un testigo mientras declara. Tal conducta asiste al juzgador de hechos en aquilatar el valor probatorio que merece el testimonio. El *demeanor* puede medirse de varias formas. El rostro es el ejemplo más obvio. Empero, las expresiones faciales del testigo son solo una de muchas maneras de comprobarlo. Este también puede valorarse al percibir los momentos en los que el testigo aclara su garganta frecuentemente, su voz vacila y cuando toma pausas prolongadas para responder una pregunta. Además, puede estimarse al observar su lenguaje corporal (*body language*): hacer movimientos nerviosos y constantes en la silla testifical, tocarse el cabello, tener las manos inquietas y evadir el contacto visual. B.W. Crews, *Michigan Rule of Evidence 611(b) and the Niqab: A Violation of Free Exercise of Religion*, 27 T.M. Cooley L. Rev. 611, 639 (2010). Asimismo, hemos reconocido como métodos de medir el *demeanor*: la manera de hablar,

contradicciones, manierismos, dudas, vacilaciones, gestos, titubeos, el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo y los demás detalles perceptibles con los sentidos. *Pueblo v. Toro Martínez*, 200 DPR 834, 857-858 (2018).

Cabe destacar que para que se concrete el Derecho a la Confrontación, el debido proceso de ley exige que, cuando sea posible, se ponga a disposición del acusado las herramientas para atacar la credibilidad de los testigos. En particular, hemos expresado que:

> [E]l debido proceso de ley exige que se pongan al alcance del acusado los medios de prueba para impugnar los testigos, atacar su credibilidad y todo recurso análogo encaminado a erradicar la falsedad del juicio y evitar el desvío de la justicia. Un careo sin estos instrumentos, **cuando sean legítimamente asequibles**, frustra el propósito del precepto constitucional. (Énfasis suplido). *Pueblo v. Guerrido López*, supra, pág. 958.

Sobre este extremo, en *Pueblo v. Ruiz Lebrón*, supra, pág. 441, este Tribunal citó con aprobación al tratadista Wigmore con relación a lo siguiente:

> [L]a ventaja secundaria que incidentalmente provee al tribunal la presencia del testigo --**la evidencia de comportamiento-- es elemento sobre el que debe insistirse siempre que puede conseguirse. Nadie duda que es altamente deseable, siempre que esté disponible. Pero es meramente deseable. Cuando no está disponible, toda exigencia desaparece.** No es parte esencial del concepto de confrontación; no descansa en mejor base que otra evidencia a la que se atribuye especial valor; y así como el original de un documento o un testigo preferido pueden dispensarse en caso de indisponibilidad, también **puede prescindirse de la evidencia de comportamiento de ser necesario.** (Énfasis suplido).

Lo antes expuesto pone de relieve que si bien hay una obligación de proporcionarle al acusado los medios para atacar la credibilidad de los testigos —lo cual incluye la observación del *demeanor*— estos deben ser legítimamente asequibles. Así pues, en ocasiones puede dispensarse de considerar el *demeanor* de un testigo en el Juicio. Precisamente en las limitadas situaciones en las que se admite prueba de referencia en contra del acusado, el juzgador de hechos no tiene el beneficio de evaluar el *demeanor* del declarante. No obstante, se ha afirmado en repetidas ocasiones que la Cláusula de Confrontación permite tales declaraciones sin que se entienda infringido el Derecho a la Confrontación. La evaluación del *demeanor* tampoco estaría disponible cuando el juzgador de hechos es no vidente. Esa circunstancia no siempre es óbice para que se conduzca un Juicio penal justo.[7] Por lo tanto, queda de manifiesto que en ciertas circunstancias puede prescindirse del beneficio del *demeanor* del testigo sin que esto violente el Derecho a la Confrontación del acusado.

Tomando en cuenta el derecho expuesto, procedemos a resolver.

III

Previo a aplicar el estándar adoptado a la controversia de autos, como cuestión de umbral es indispensable contextualizar la controversia de acuerdo

---

[7] Véanse *e.g. People v. Hayes*, 923 P.2d 221, 225-227 (1995); *People v. Caldwell*, 603 N.Y.S.2d 713, 715-716 (1993); *Galloway v. Superior Court of the D.C.*, 816 F. Supp. 12, 16-17 (1993).

con la pandemia que vivimos. Ante tal crisis, la Rama Judicial no ha permanecido estacionaria. Así, ha reconocido la existencia de un estado de emergencia judicial que hace imperativo la implantación de medidas de seguridad[8] y, como consecuencia, ha desarrollado un plan de acción con el propósito de reestablecer escalonadamente la totalidad de los servicios que brinda.[9] Conscientes de los riesgos que conlleva el COVID-19, esto se ha hecho de forma mesurada y tomando en consideración las estadísticas de contagio y sus variaciones.

Nadie ha estado exento de experimentar algún desagrado a causa de la pandemia. Sin embargo, los tribunales debemos, dentro de lo alcanzable, normalizar nuestras funciones. Esto debe ocurrir de tal manera que se garantice el acceso seguro a los tribunales.

Al amparo de nuestro poder inherente para reglamentar los procesos judiciales en situaciones de emergencia como la presente, tenemos la obligación de procurar el bienestar del personal y de la ciudadanía que acude a los tribunales. Lo contrario sería una irresponsabilidad. En atención a ello, al reiniciar la celebración de Juicios penales debe hacerse un balance entre el interés de salvaguardar las garantías individuales de los acusados y

---

[8] *In re*: Medidas Judiciales ante situación de emergencia de salud por el Covid-19, EM-2020-12 (22 de mayo de 2020). *In re*: Medidas Judiciales ante situación de emergencia de salud por el Covid-19, EM-2020-10 (2 de mayo de 2020); *In re*: Medidas Judiciales ante situación de emergencia de salud por el Covid-19, EM-2020-07 (13 de abril de 2020); *In re*: Medidas Judiciales ante situación de emergencia de salud por el Covid-19, EM-2020-03 (16 de marzo de 2020).
[9] *Plan de Contingencia y Control de Exposición y Propagación del Covid-19 de la Rama Judicial*, 20 de mayo de 2020, http://ramajudicial.pr/Prensa/comunicados/2020/05-21-20.pdf (última visita 24 de agosto de 2020).

las necesidades salubristas que deben adoptarse para el beneficio de los participantes del proceso judicial.

A medida que se retomen las vistas en los tribunales, los jueces deberán responsablemente atemperar el funcionamiento de sus salas a tenor con la amenaza del COVID-19. Además de las políticas de emergencia que pudiera establecer la Oficina de Administración de los Tribunales (OAT), los jueces deberán ejercer su discreción al poner en práctica las medidas de protección que entiendan correspondientes. Sobre este particular, no debe existir duda en cuanto a que:

> [E]l efectivo funcionamiento de nuestro sistema judicial y la más rápida disposición de los asuntos litigiosos **compatibles con los derechos de la sociedad en general y de los ciudadanos en particular,** requiere que nuestros jueces de instancia tengan gran flexibilidad y discreción para [lidiar] con los graves problemas que conlleva el diario manejo y tramitación de los asuntos judiciales y el administrar un eficiente sistema de justicia. Ello presupone que nuestros jueces de instancia tengan poder y autoridad suficiente para conducir los asuntos litigiosos ante su consideración y para aplicar correctivos apropiados de la manera y forma que su **buen juicio, discernimiento** y su sana discreción les indique, facultad con la cual no intervendremos excepto cuando sea absolutamente necesario con el propósito de evitar una flagrante injusticia. (Énfasis suplido). *Pueblo v. Vega, Jiménez*, 121 DPR 282, 287 (1988).

Las medidas de protección que los jueces y juezas de instancia pudieran patrocinar son amplias. Ahora bien, las que constantemente se promueven son el distanciamiento

social y el uso de mascarillas que cubran la boca y nariz.[10]

La entidad Centros para el Control y la Prevención de Enfermedades (CDC, por sus siglas en inglés) ha sido enfática en cuanto a que "[e]veryone should wear a mask in public settings and when around people who don't live in [their] household".[11] Al mismo tiempo, se ha señalado que el virus puede propagarse a través de "gotitas respiratorias que se producen cuando una persona infectada tose, estornuda o habla".[12] A este respecto se sospecha que la transmisión aérea del COVID-19 aumenta en cuartos cerrados que tengan aire acondicionado.[13] Asimismo, el contagio puede propagarse mediante el contacto con objetos o superficies infectadas. Por tal motivo, debe tomarse en cuenta el entorno del testigo, particularmente el área en la cual declarará. Considerando lo anterior, estimamos insuficiente para proteger a los testigos la instalación de unos cristales acrílicos alrededor de la silla testifical como opción excluyente del uso de mascarillas. Por otra parte, referente al uso de protectores faciales transparentes (*face shields*), la CDC ha expresado que

---

[10] *Protégete del COVID-19: Medidas de Prevención*, Departamento de Salud de Puerto Rico, http://www.salud.gov.pr/Pages/Medidas_de_Prevencion.aspx (última visita 24 de agosto de 2020).

[11] *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself & Others*, Centers for Disease Control and Prevention (CDC), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (última visita 24 de agosto de 2020).

[12] *Protégete del COVID-19: Transmisión*, Departamento de Salud de Puerto Rico, http://www.salud.gov.pr/Pages/Protegete_del_COVID19.aspx (última visita 24 de agosto de 2020).

[13] A. Powell, *Is air conditioning helping spread COVID in the South?*, The Harvard Gazette, 29 de junio de 2020, https://news.harvard.edu/gazette/story/2020/06/air-conditioning-may-be-factor-in-covid-19-spread-in-the-south/ (última visita 24 de agosto de 2020).

"[t]here is currently not enough evidence to support the effectiveness of face shields for source control. Therefore, CDC does not currently recommend use of face shields as a substitute for masks".[14] Esto resulta pertinente ya que hay ocasiones en las que personas infectadas no demuestran síntomas. Por entender fiable las recomendaciones de esta entidad, no apoyamos el uso de *face shields* como sustitutivo de una mascarilla que cubra la boca y nariz. No se excluye la posibilidad de que se pueda requerir el uso de mascarillas transparentes que permitan observar la boca, sujeto, claro está, a su disponibilidad en Puerto Rico. Enfatizamos que los jueces y juezas deberán ejercer un buen juicio que tome en cuenta las sugerencias de las autoridades con competencia.

En este caso la Jueza de instancia le ofreció al recurrido como primera alternativa el que la vista del Juicio menos grave se realizara mediante el sistema de videoconferencias de la Rama Judicial. **El sistema de videoconferencias le hubiera provisto al recurrido la oportunidad de conducir el contrainterrogatorio sin que el testigo declarara con una mascarilla.** No obstante, el recurrido descartó esta alternativa.[15] Así las cosas, la Jueza proveyó no ha lugar a la petición del recurrido en cuanto a exigirles a los testigos declarar sin mascarilla protectora en el Juicio presencial. Posteriormente, el

---

[14] *Coronavirus Disease 2019 (COVID-19): Considerations for Wearing Masks*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html (última visita 24 de agosto de 2020).
[15] Está fuera del alcance de esta decisión la validez de un Juicio mediante videoconferencia.

Tribunal de Apelaciones revocó la determinación del Tribunal de Primera Instancia y ordenó que los testigos declararan sin mascarilla para garantizar el Derecho a la Confrontación del recurrido.

En primer lugar, la Cláusula de Confrontación comprendida tanto en la Constitución Federal como en la Estatal no es absoluta. Como ya señalamos, en *Coy v. Iowa*, supra, el Tribunal Supremo de Estados Unidos reconoció que el derecho a carease con los testigos de cargo no es tajante y permite excepciones. A pesar de que en ese caso no procedía aplicar una excepción al mencionado derecho, no se descartó que pudieran existir excepciones siempre que fueran necesarias para adelantar una política pública importante.

Posteriormente, el Tribunal Supremo Federal tuvo la oportunidad de efectivamente reconocer una excepción en *Maryland v. Craig*, supra. En lo pertinente, allí señaló que: "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured". Por lo tanto, el estándar bajo *Maryland v. Craig*, supra, compone dos criterios para limitar el derecho al careo: (1) que se adelante una política pública importante, y (2) que se asegure la confiabilidad del testimonio.

Conforme al estándar que recién adoptamos a la luz de *Maryland v. Craig*, supra, cuando se cumple con el requisito de adelantar una política pública importante, se permitirá una confrontación cara a cara limitada solo si la confiabilidad del testimonio está asegurada de otra manera. La otra manera para asegurar la confiabilidad se mide a base del **efecto combinado** de los elementos del derecho al careo, a saber: (1) presencia física; (2) testimonio bajo juramento; (3) oportunidad de contrainterrogar, y (4) oportunidad de evaluar el *demeanor* del testigo. En otras palabras, la convergencia de estos elementos constituye el derecho al careo en todo su esplendor.

Aunque en *Maryland v. Craig*, supra, el elemento del derecho a la confrontación cara a cara que se vio afectado fue el de presencia física, el análisis esbozado no varía si el elemento que se afecta es otro, como sería la apreciación del *demeanor* del testigo. En esencia, se debe sopesar la política pública importante junto a los elementos que componen el derecho al careo. Se podrá limitar este derecho siempre que la política pública lo justifique y, a su vez, se reúnan la mayoría de los elementos que garantizan la confiabilidad del testimonio, recordando que el derecho al contrainterrogatorio es el elemento indispensable.

Al identificar si se cumple con el primer requisito del estándar, apuntamos que en *Coy v. Iowa*, supra, pág. 1021, se hizo hincapié en que no habían observaciones

individualizadas que explicaran por qué las testigos necesitaban una protección especial al ofrecer su testimonio. Por tal razón, con el caso de *Maryland v. Craig*, supra, quedó de manifiesto que se requiere una determinación específica de que se justifica la limitación del derecho al careo. No empece lo anterior, a diferencia del asunto examinado en *Coy v. Iowa*, supra, requerir que se lleve a cabo una vista de necesidad para auscultar la razón por la que un testigo debe declarar con mascarilla protectora, resulta ser un ejercicio fútil ante la pandemia que actualmente agobia a nivel mundial. Es harto conocido que el COVID-19 es un mal altamente contagioso, que ha causado un número significativo de muertes en Puerto Rico y que todos estamos susceptibles de sufrir. Así lo demuestran estudios científicos y las recomendaciones de las agencias pertinentes. Por lo tanto, no es necesario hacer un estudio individualizado sobre ello en la controversia ante nos. En definitiva, se cumple el primer peldaño bajo el estándar ya que existe una política pública apremiante a, no solo permitir el uso de mascarillas en la silla testifical, sino exigirlo.

Por tanto, restaría corroborar que se cumple con el segundo requisito del estándar, dirigido al resguardo de la confiabilidad del testimonio. Según previamente señalamos, en este caso el elemento del derecho al careo afectado es el del *demeanor*.

Resolvemos que declarar con una mascarilla quirúrgica o una mascarilla de tela que cubra solo la boca y la parte

inferior de la nariz no incide sobre la confiabilidad del testimonio ofrecido por un testigo si, como ocurre aquí, se cumplen los demás elementos del derecho al careo. El recurrido podrá hacer preguntas y el testigo responderlas, de manera que se estaría garantizando su derecho a contrainterrogar a los testigos de cargo que, como advertimos, es la piedra angular del Derecho a la Confrontación. Además, en casos como estos se cumple con que los testigos estén presentes físicamente en el Tribunal y en la misma sala que el acusado, que el testimonio sea dado bajo juramento e incluso, aunque de manera más limitada de lo acostumbrado, también se cumple con que el acusado tenga la oportunidad de evaluar el *demeanor* del testigo. El hecho de que cubrir la boca y la nariz con una mascarilla protectora no permite observar estas facciones de la cara no significa que no pueda constatarse el *demeanor* del testigo. El *demeanor* de un testigo puede verificarse, *inter alia*, mediante observación del lenguaje corporal, gestos que hace con los ojos y las cejas, titubeos, contradicciones, manierismos, dudas y vacilaciones. Es decir, la evaluación del *demeanor* no se circunscribe a la boca y nariz del testigo, sino que comprende muchísimas otras características. Así pues, en este caso el efecto combinado de los elementos de confiabilidad del testimonio cumple los propósitos de la Cláusula de Confrontación.

No estamos ajenos a que existen diferentes tipos de mascarillas que, en mayor o menor grado, cubren el rostro

de quienes las utilizan. Igualmente, a que unas son más gruesas que otras. El uso de una u otra mascarilla está sujeta a la discreción del buen juicio y discernimiento de los jueces de instancia, tal cual indicamos. Subrayamos que las mascarillas quirúrgicas son las más comunes y, para efectos de los testigos que declaran presencialmente en un tribunal, la opción más sensata; no solo por su cualidad de desechables, sino porque no representan obstáculo para escuchar la voz de los testigos ni cubre en exceso los rasgos de sus rostros. Insistimos en que las mascarillas utilizadas deben ofrecerle al acusado la oportunidad efectiva de contrainterrogar a los testigos para satisfacer el Derecho a la Confrontación y las mascarillas quirúrgicas cumplen adecuadamente este objetivo.

Finalmente, recalcamos que el que pueda limitarse el derecho a confrontarse cara a cara con los testigos no significa que este derecho será dispensado fácilmente. Estará sujeto a los dos requisitos del estándar explicado. Al no estar comprometidos significativamente todos los elementos señalados, en este caso se cumple en su totalidad con el estándar. Ante la emergencia sanitaria que vivimos por el COVID-19, mediante el uso de una mascarilla protectora se garantizaría el Derecho a la Confrontación del recurrido sin descuidar la salud de todas las personas presentes en la sala incluyendo a la Jueza, secretaria, alguacil, abogados, testigos y hasta el propio recurrido.

IV

Por los fundamentos expresados, se resuelve que el uso de mascarillas por parte de los testigos, en el contexto del COVID-19, no violenta la Cláusula de Confrontación.

Conforme a lo anterior, revocamos la Sentencia recurrida y devolvemos el caso al Tribunal de Primera Instancia para procedimientos ulteriores consistentes con esta Opinión.

Se dictará Sentencia de conformidad.


Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Daniel Cruz Rosario<br><br>Recurrido | CC-2020-250 | |

SENTENCIA

En San Juan, Puerto Rico, a 25 de agosto de 2020.

Por los fundamentos expresados en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se resuelve que el uso de mascarillas por parte de los testigos, en el contexto del COVID-19, no violenta la Cláusula de Confrontación.

Conforme a lo anterior, revocamos la Sentencia recurrida y devolvemos el caso al Tribunal de Primera Instancia para procedimientos ulteriores consistentes con esta Opinión.

Notifíquese inmediatamente.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión de Conformidad. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión de Conformidad. El Juez Asociado señor Martínez Torres emitió una Opinión Disidente. El Juez Asociado señor Kolthoff Caraballo disiente y hace constar la expresión siguiente:

> El Juez Kolthoff Caraballo disiente respetuosamente de la determinación de la Mayoría. Esto, por entender que la utilización de una careta plástica transparente ("*face shield mask*") durante el testimonio de los testigos de cargo, unido a las demás medidas de

salubridad, como son -entre otras- el uso **estricto** y **constante** de mascarillas de tela o

quirúrgicas por el resto de las personas en el salón, cumple con la política del Estado de evitar la contaminación durante este período de pandemia, a la vez que asegura el derecho a la confrontación del acusado.

Los Jueces Asociados señores Estrella Martínez y Colón Pérez disienten con Opinión escrita.


José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

       v.

Daniel Cruz Rosario

    Recurrido

CC-2020-0250    *Certiorari*

La Jueza Presidenta ORONOZ RODRIGUEZ emitió una Opinión de conformidad.

En San Juan, Puerto Rico, a 25 de agosto de 2020.

Estoy conforme con el dictamen que hoy emitimos. Ante un interés público tan importante como la protección de la salud y la vida de cada persona que participa en el procedimiento judicial, el uso de la mascarilla durante el testimonio en la etapa de juicio cumple con el estándar que esbozó el Tribunal Supremo federal en Maryland v. Craig, 497 US 836 (1990). Según resuelve la Opinión mayoritaria, el derecho a la confrontación no prohíbe categóricamente que un testigo declare en un juicio con una mascarilla cuando ello resulta necesario para prevenir la propagación del COVID-19.

Aclaro, no obstante, que nuestra determinación no

nos priva de adoptar métodos alternos que incidan mínimamente en los derechos de los acusados y que sirvan mejor a los intereses importantes que están en juego. El mecanismo de la videoconferencia —en conjunto con ciertas garantías— ofrece un medio seguro que se debe implementar durante el periodo que dure la pandemia producto del COVID-19. Así, en adelante, se debe recurrir a la presentación del testimonio de manera presencial con el uso de mascarilla solo en casos excepcionales donde las circunstancias lo ameriten.

## I.

Por hechos que se remontan al 21 de noviembre de 2019, el Ministerio Público presentó una denuncia contra el señor Daniel Cruz Rosario (recurrido) por infracción al Art. 178 del Código Penal de Puerto Rico, 33 LPRA sec. 5244 (intrusión en la tranquilidad personal). Luego de varios trámites procesales, el 16 de junio de 2020 el Tribunal de Primera Instancia emitió una Resolución en la que señaló la celebración del juicio en su fondo por tribunal de derecho para el 7 de julio de 2020.[16] En ese dictamen, el foro primario dispuso que se promovería el uso del sistema de videoconferencias para atender las vistas durante el juicio.[17]

En respuesta, el recurrido presentó una *Moción informativa solicitando vista de juicio presencial sin*

_____

[16] La Resolución se notificó el 22 de junio de 2020.
[17] Conforme a ello, el Tribunal de Primera Instancia ordenó que las partes identificaran una dirección de correo electrónico dentro de un término que no fuera menor de cinco (5) días antes de la fecha que se señaló para la celebrar la vista con el motivo de coordinar la invitación a la videoconferencia. *Certiorari*, Apéndice, pág. 34.

*mascarillas a los testigos declarantes, y otros extremos* en la que se opuso a que la vista se celebrase mediante el sistema de videoconferencia. Sostuvo que tanto el derecho constitucional a la confrontación como el debido proceso de ley exigían la celebración del juicio de manera presencial. Adujo además que al amparo de esas garantías constitucionales el tribunal también debía ordenar que la testigo declarara sin mascarilla. Argumentó que el uso de la mascarilla impide al juzgador aquilatar la credibilidad del testimonio al afectar significativamente el comportamiento corporal (*demeanor*) de la testigo.

El 26 de junio de 2020 el Tribunal de Primera Instancia emitió un dictamen en el que proveyó *no ha lugar* a la moción que presentó el recurrido.[18] Inconforme, este último acudió al Tribunal de Apelaciones. El 3 de julio de 2020 el foro apelativo intermedio emitió y notificó una Sentencia mediante la cual revocó la Resolución del foro primario. Determinó que el derecho constitucional al careo y a la confrontación incluye la observación del *demeanor* del testigo mientras declara. Razonó que la mascarilla le imposibilita al juzgador de los hechos contar con todos los elementos de juicio necesarios para adjudicar el *demeanor* del testigo y la credibilidad del testimonio. Adujo además que el uso de la mascarilla durante el interrogatorio impide al abogado de defensa levantar los señalamientos correspondientes en torno al comportamiento

---

[18] *Resolución*, Apéndice, pág. 25. El dictamen se notificó el 29 de junio de 2020.

del testigo. Ante ello, concluyó que el derecho a la confrontación del acusado exigía que se celebrara el juicio en su fondo de manera presencial y sin que los testigos usaran la mascarilla mientras declararan.

Nótese que el Tribunal de Apelaciones no ponderó el alcance del derecho constitucional a la confrontación cuando el interrogatorio a los testigos en el juicio se celebra por el sistema de videoconferencia, **fundamento que inició el recurso interlocutorio que se instó en ese foro**.[19] Sin embargo, en una disidencia se expresó la inconformidad con que el foro apelativo intermedio no le ofreciera la oportunidad al Procurador General para que expresara su postura sobre el particular. Asimismo, se

---

[19] La Orden del Tribunal de Primera Instancia que originó el recurso interlocutorio que se instó ante el Tribunal de Apelaciones fue la que se dictó el 16 de junio de 2020 y que se notificó el 22 de junio de 2020. En ella, se dispuso:

> El Tribunal promueve el uso del sistema de videoconferencias para atender las vistas. A esos efectos, las partes deberán enviar un correo electrónico a la siguiente dirección […] dentro de un término que no será menor de cinco (5) días antes de la vista, a fin de tramitar la coordinación de la invitación correspondiente.

El recurrido se opuso y solicitó: (1) que la vista no se celebrara por videoconferencia, y (2) que se celebrara la vista pendiente que se suspendió —la del 14 de abril de 2020— de manera presencial y sin que el testigo declarara con mascarilla. *Moción informativa solicitando vista de juicio presencial sin mascarillas a los testigos declarantes, y otros extremos*, Apéndice, págs. 27-28. El 26 de junio de 2020 — notificado el 29 de junio de 2020— la Hon. Valerie Concepción Cintrón **se limitó a proveer** *no ha lugar* **a la moción** en su totalidad. *Notificación*, Apéndice, pág. 25. El recurrido acudió al Tribunal de Apelaciones para revisar ese dictamen. Por lo tanto, **la controversia sobre si el juicio se podía celebrar por medio de la videoconferencia también estaba ante la consideración del foro apelativo intermedio al momento de atender el recurso**. El hecho de que el recurrido se haya opuesto a ese método no cambia la naturaleza de lo que se solicitaba allí. Tampoco debe movernos el hecho de que el Tribunal de Primera Instancia modificara posteriormente su determinación a tenor de lo dispuesto en la Sentencia del Tribunal de Apelaciones, pues esas modificaciones surgieron antes de que el foro primario recibiera el mandato del foro apelativo intermedio. Como norma general, cualquier dictamen posterior que haya realizado un foro inferior cuando un tribunal revisor aún ostenta la jurisdicción del caso se considera inválido por haberse dictado sin jurisdicción.

**cuestionó cómo se afectaría el derecho a la confrontación del acusado si se permitía celebrar el interrogatorio por videoconferencia.**[20]

El 10 de julio de 2020, **antes de recibir el mandato del Tribunal de Apelaciones,**[21] el foro primario emitió una Orden en la que tomó conocimiento de la Sentencia que emitió el foro apelativo intermedio. Además, ordenó que el juicio en su fondo se celebrara en dos salones separados, conectados con equipo audiovisual que permitiera la comunicación entre ambos salones. Adicionalmente dispuso que se le proveerían a los testigos *face shields* para que sean utilizados durante el interrogatorio. Asimismo, señaló el juicio en su fondo para el 13 de julio de 2020.

Finalmente, el 29 de julio de 2020 el Procurador General presentó ante esta Curia el recurso de *certiorari*

---

[20] En específico, el Juez del Tribunal de Apelaciones, Hon. Nery E. Adames Soto, expresó en un Voto disidente:

> Aunque, por una parte, coincido con el razonamiento del Panel respecto a que la protección del derecho constitucional a la confrontación supone o incluye necesariamente examinar los gestos, expresiones, tonos de voz, y el demeanor en general del testigo bajo contrainterrogatorio, asunto que se vería imposibilitado por el uso de la máscara en el rostro, por otra parte **no veo cómo se afectaría dicho derecho ante la posibilidad de que se permita el interrogatorio a través del sistema de videoconferencia**, por ejemplo. El planteamiento resulta novel por causa de la situación de la pandemia, lo que ameritaba que concediéramos espacio al Procurador General para que expresase su postura.

*Voto disidente del Juez Nery E. Adames Soto*, Apéndice, págs. 9-10. (Énfasis suplido).

[21] Este hecho quedó constatado en la *Minuta* de la vista del 13 de julio de 2020. *Minuta*, Apéndice, pág. 39. Allí, el Ministerio Público le preguntó a la Hon. Valerie Concepción Cintrón si había recibido el mandato del Tribunal de Apelaciones a lo que esta indicó que no. El Ministerio Público informó a la Jueza su intención de acudir en *certiorari* ante este Tribunal. En consecuencia, el foro primario cambió la fecha del juicio para el 3 de agosto de 2020 para que el Ministerio Público tuviera la oportunidad de recurrir ante este Foro. Íd.

que nos ocupa.[22] Arguyó que el Tribunal de Apelaciones se equivocó al revocar la Resolución del foro primario y sostener que los testigos debían declarar en sala sin mascarillas, contrario a las instrucciones médicas y gubernamentales. Indicó además que el Tribunal de Apelaciones se equivocó al no valorar el interés apremiante del Estado en mantener y preservar la salud de todos a través del uso de la mascarilla. Cuestionó además los fundamentos del foro apelativo intermedio para concluir que el uso de la mascarilla coarta los derechos constitucionales del acusado.[23]

El 31 de julio de 2020 ordenamos la paralización de cualquier procedimiento en el Tribunal de Primera Instancia hasta que dispusiéramos de este asunto. Simultáneamente, expedimos el recurso de *certiorari* que se nos presentó.

II.

A.

La Enmienda Sexta de la Constitución de Estados Unidos reconoce el derecho de todo acusado a confrontarse con los testigos que declaren en su contra. Emda. VI, Const. EE. UU., LPRA, Tomo 1. Este derecho fundamental aplica a los gobiernos estatales al amparo de la cláusula del debido

---

[22] El Procurador General acompañó al recurso de *certiorari* que presentó una *Moción en auxilio de jurisdicción* en la que nos solicitó que paralizáramos los procedimientos en el Tribunal de Primera Instancia hasta tanto resolviéramos la controversia.

[23] En su comparecencia ante nosotros, el Procurador General no presentó su postura sobre la celebración de la vista por videoconferencia. Tampoco nos solicitó que se ordenara la celebración del juicio por videoconferencia como dispuso la Hon. Valerie Concepción Cintrón en la Orden que emitió el 16 de junio de 2020.

proceso de ley de la Enmienda Decimocuarta, Enmda. XIV, Const. EE. UU., LPRA, Tomo 1; Pointer v. Texas, 380 US 400 (1965). De igual forma, la Constitución de Puerto Rico también garantiza que, en todo proceso criminal, el acusado tenga "derecho a carearse con los testigos de cargo". Const. ELA, Art. II, Sec. 11, LPRA, Tomo 1.

Se ha reconocido, tanto bajo la Constitución federal como la estatal, que el derecho a la confrontación opera en la etapa de juicio. Barber v. Page, 390 US 719, 725 (1968); véase también Pueblo v. Rodríguez Aponte, 116 DPR 653, 660 (1985). Su objetivo principal es evitar la celebración de los juicios mediante declaraciones *ex parte* y deposiciones, privándole al acusado la oportunidad de examinar y contrainterrogar personalmente a los testigos. Mattox v. US, 156 US 237, 242 (1895). De esa forma, el acusado tiene un derecho a cuestionar el testimonio del declarante, obligándolo a comparecer frente al juzgador de los hechos, quien finalmente adjudicará la credibilidad de las declaraciones basado en los dichos del testigo y su comportamiento en sala. Íd., págs. 242-243. Cónsono con lo anterior, el derecho a la confrontación: (1) asegura que el testigo declare bajo juramento y en presencia del acusado, so pena de perjurio si ofrece testimonio falso; (2) sujeta al testigo al contrainterrogatorio, y (3) le permite al juzgador la oportunidad de adjudicar la credibilidad del testimonio observando el comportamiento del testigo mientras declara. Véase California v. Green,

399 US 149, 158 (1970). Así, se pretende asegurar la confiabilidad de la evidencia testimonial que se presenta en el juicio sujetándola a un escrutinio adversativo riguroso. Maryland v. Craig, supra, pág. 846.

A base de lo anterior, hemos reconocido que el derecho a la confrontación tiene tres vertientes, a saber: (1) el derecho al careo o a la confrontación cara a cara con los testigos de cargo; (2) el derecho a contrainterrogar, y (3) el derecho a que se excluya cierta prueba de referencia. Pueblo v. Pérez Santos, 195 DPR 262, 269-270 (2016).

B.

La Constitución de Puerto Rico dispone expresamente el derecho a "carearse con los testigos de cargo". Const. ELA, supra, Art. II, Sec. 11. En su sentido literal, ese derecho supone "la confrontación cara a cara entre el testigo de cargo y el acusado en presencia del tribunal". Pueblo v. Ruiz Lebrón, 111 DPR 435, 452 (1981) (Juez Asociado Irizarry Yunqué, Opinión disidente). Aunque en un momento en Puerto Rico el derecho al careo estuvo un tanto rezagado,[24] el Tribunal Supremo federal confirmó su esencialidad posteriormente al amparo de la Constitución de los Estados Unidos.

Distinto a nuestra Carta Magna, la Constitución federal no menciona expresamente el derecho al careo. No obstante, su inclusión como parte de la cláusula de

---

[24] E. L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Adjudicativa*, San Juan, Ed. Situm, 2018, págs. 80, 82.

confrontación de la Enmienda Sexta ha sido reiterada por el Máximo Foro federal. Maryland v. Craig, supra, pág. 847 (citando a California v. Green, supra, pág. 157) ("[F]ace-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause'"); Coy v. Iowa, 487 US 1012, 1016 (1988) ("We have never doubted, therefore, that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact"). De esa forma, se ha entendido que el careo como parte del derecho a la confrontación supone la presencia en el juicio tanto del acusado como del testigo. Coy v. Iowa, supra; E. L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Adjudicativa*, San Juan, Ed. Situm, pág. 109.

En esa línea, en Coy v. Iowa, supra, se reafirmó la importancia del careo para el derecho a la confrontación. Allí se dijo que, en conjunto con el derecho a contrainterrogar, la confrontación cara a cara entre el testigo y el acusado promueve la búsqueda de la verdad y, por consiguiente, garantiza la integridad de un juicio justo. Coy v. Iowa, supra, págs. 1019-1020.[25] Sin embargo, se reconoció la posibilidad de que existieran causas excepcionales en las que se necesitara adelantar un

---

[25] En Coy v. Iowa, 487 US 1012, 1017 (1988), el Tribunal Supremo federal expresó: "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution'". (citando a Pointer v. Texas, 380 US 400, 404 (1965)). En esa línea, razonó: "It is always more difficult to tell a lie about a person *to his face* than *behind his back*". Íd., pág. 1019. Así, concluyó que: "[T]he right to face-to-face confrontation […] [and] the right to cross-examine the accuser[,] both 'ensur[e] the integrity of the fact-finding process'" (citando a Kentucky v. Stincer, 482 US 730, 736 (1987)).

interés de política pública importante que justificara afectar ese derecho. Íd., pág. 1021. Sobre el particular, en Coy v. Iowa, supra, pág. 1021 se dijo: "**[W]e can identify exceptions, in light of other important interests, to the irreducible literal meaning of the Clause** […]. We leave for another day, however, the question whether any exceptions exists. Whatever they may be, they would surely be allowed only when necesary to further an important public policy". (Énfasis suplido).

En Maryland v. Craig, supra, el Tribunal Supremo federal se enfrentó por primera vez a una de esas excepciones. En ese caso se cuestionó la constitucionalidad de un estatuto que permitía que víctimas de delitos sexuales que fueran menores edad testificaran a través de un sistema de vídeo de circuito cerrado desde un salón separado de la sala donde se encontraba el acusado. Consistía en una especie de videoconferencia de una sola dirección en la que las personas en la sala podían ver y escuchar al declarante, pero este no podía percibirlos a ellos. Previo a adoptar ese mecanismo, el estatuto disponía que se debía realizar un análisis individualizado de las circunstancias particulares de cada caso que justificaran la necesidad de desviarse del interrogatorio tradicional.

El Tribunal Supremo federal sostuvo la constitucionalidad del estatuto. Aunque reafirmó la esencialidad del derecho a que los testigos declaren

frente al acusado, se determinó que ese derecho no es absoluto ni indispensable. Íd., págs. 849-850. Se dijo además que, ante la necesidad de adelantar un interés público importante —a modo excepcional y particular a cada caso— la cláusula de confrontación permitía que se afectara el derecho al careo siempre y cuando la confiabilidad del testimonio se garantizara de otra manera. Íd., pág. 850. Para ello, recalcó que la confiabilidad del testimonio surge del efecto combinado de los cuatro (4) elementos que componen la zapata del derecho a la confrontación: (1) presencia física, (2) juramento, (3) oportunidad para contrainterrogar, y (4) que el juzgador de los hechos pueda apreciar el *demeanor* del testigo. Íd., pág. 846. Por ende, el Máximo Foro federal razonó que la confiabilidad del testimonio podía sostenerse, aun a falta de presencia física, cuando concurren los demás elementos. Sobre la medida particular que se adoptó en ese caso, el Tribunal Supremo federal expresó:

> We find it significant, however, that Maryland's procedure preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous crossexamination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies. Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a

manner functionally equivalent to that accorded live, in-person testimony. Íd., pág. 851.

Nótese que, en Maryland v. Craig, supra, el Máximo Foro federal enfatizó que **la medida propuesta no solo era necesaria para adelantar un interés público importante, sino que también afectaba mínimamente el derecho al careo**. Esto último, pues aseguraba la confiabilidad del testimonio sin afectar el carácter adversativo del juicio al permitir que se llevara a cabo el contrainterrogatorio. Véase Maryland v. Craig, supra, págs. 856-857; Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Adjudicativa*, *op. cit.*, págs. 84-86.

Bajo el estándar que se estableció en Maryland v. Craig, supra, el derecho a la confrontación permite el menoscabo al derecho al careo si: (1) la medida propuesta es necesaria para adelantar un interés público importante, y (2) se puede asegurar la confiabilidad del testimonio, al analizar la existencia y el alcance de los elementos siguientes: (1) la presencia física; (2) el testimonio bajo juramento; (3) la oportunidad de contrainterrogar, y (4) la oportunidad de que el juzgador de los hechos pueda evaluar el comportamiento o *demeanor* del testigo. Cabe señalar que ese estándar, aunque riguroso, no exige que los tribunales escudriñen entre las opciones disponibles la más restrictiva al Estado o la más favorable al acusado. Lo único que se exige es que se cumpla con el alto estándar que allí se dispone.

Según concluimos hoy, el estado de emergencia vigente que creó la pandemia del COVID-19 constituye indudablemente un interés público lo suficientemente importante como para justificar la imposición de medidas a favor de la seguridad del componente humano en los procedimientos judiciales, incluyendo aquellos de naturaleza penal.[26] Por lo tanto, resta determinar si las medidas propuestas relevantes a esta controversia —entiéndase, el uso de mascarillas por el testigo durante el interrogatorio en el juicio o la celebración de este por medio de videoconferencia— son necesarias para adelantar ese interés y si ofrecen garantías de confiabilidad suficientes al amparo del derecho a la confrontación.

III.

A.

Según expone la Opinión mayoritaria, existen estudios de las autoridades de alto peritaje científico y de la salud sobre la efectividad del uso de mascarillas para prevenir que el virus del COVID-19 se propague. Al momento, la agencia gubernamental *Centers for Disease Control and Prevention* (CDC) desaconseja la implementación de otros métodos de prevención como sustituto al uso de la mascarilla en espacios públicos y cuando se esté al

---

[26] Coincido con la Opinión mayoritaria en que, en estos momentos, requerir la celebración de la vista de necesidad para estos propósitos constituye un ejercicio fútil. No obstante, eso será así únicamente mientras dure el estado crítico de emergencia en el que nos encontramos. Quedará en la sana discreción del Tribunal de Primera Instancia determinar cuándo celebrar la vista de necesidad en consideración al estado de la situación que impere por el COVID-19.

alcance de personas que no viven en el mismo hogar.[27] Por lo tanto, obligar a que el testigo no se retire su mascarilla al declarar presencialmente en el juicio constituye una medida necesaria que adelanta, sin duda, un interés público importante.

Aplicando el estándar que hoy esbozamos, podemos determinar que el testigo: (1) estará declarando presencialmente en sala, por lo que se cumple con el criterio de presencia física; (2) ofrecerá juramento, y (3) estará sujeto a contrainterrogatorio, elemento indispensable bajo el derecho a la confrontación. Dado que el uso de la mascarilla cubre una parte de la cara del testigo, el elemento que se afecta parcialmente es la oportunidad de que el juzgador de los hechos pueda observar el *demeanor* del testigo mientras ofrece su testimonio.

Como señalamos en la Opinión mayoritaria, el *demeanor* se refiere a la conducta no verbal que exterioriza un testigo mientras declara. Valga mencionar que el *demeanor* tiene poder comunicativo. Su relevancia en los procedimientos judiciales está plasmada también en nuestro derecho positivo; se codifica en la Regla 608 de Evidencia, 32 LPRA Ap. VI, R. 608, como uno de los medios de prueba para impugnar la credibilidad del testigo.[28]  A

---

[27] Véase *Centers for Disease Control and Prevention (CDC), Coronavirus Disease 2019 (COVID-2019): How to Protect Yourself and Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

[28] La Regla 608 de Evidencia, 32 LPRA Ap. VI, R. 608, dispone:

    REGLA 608. Credibilidad e impugnación de testigos.

tenor de lo anterior, el juzgador de los hechos debe "aquilatar el testimonio, para lo cual, por supuesto, hay que considerar la impugnación que sufrió el testigo, si alguna, la naturaleza creíble o inverosímil del testimonio y su comportamiento al testificar (demeanor)". E. L. Chiesa Aponte, *Tratado de derecho probatorio: Reglas de Evidencia de Puerto Rico y federales*, Santo Domingo, Publicaciones JTS, 1998, T. II, págs. 1231-1232. De esa forma, hemos reconocido que el *demeanor* incluye: las expresiones mímicas, el color de las mejillas, el temblor o la consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, gestos, titubeos, dudas, vacilaciones y otros detalles perceptibles a los sentidos. <u>Pueblo v. Toro Martínez</u>, 200 DPR 834, 857-858 (2018); <u>Argüello v. Argüello</u>, 155 DPR 62, 78 (2001); <u>Ortiz v. Cruz Pabón</u>, 103 DPR 939, 947 (1975).

Nótese que, en ocasiones, hemos cuestionado la confiabilidad del *demeanor* al comentar que "es altamente improbable estudiar a través de una observación tan rápida, en circunstancias tan poco deseables como la que brinda un juicio sobre los hechos, la conducta moral de un testigo". <u>Sanabria v. Sucn. González</u>, 82 DPR 885, 993 (1961). Por lo tanto, aunque el *demeanor* es una pieza

---

[…]

(b) Medios de prueba.—La credibilidad de una persona testigo podrá impugnarse o sostenerse mediante cualquier prueba pertinente, incluyendo los aspectos siguientes:

(1) Comportamiento de la persona testigo mientras declara y la forma en que lo hace.

importante para evaluar la credibilidad del testimonio, ciertamente no es el único factor al momento de realizar un juicio valorativo para adjudicar mendacidad. Véase In re Ruiz Rivera, 168 DPR 246, 272 (2006) (Jueza Asociada Fiol Matta, Opinión disidente).

Ciertamente, el *demeanor* compone un elemento importante comprendido en el derecho al careo. Sin embargo, como determinó el Tribunal Supremo federal en Maryland v. Craig, supra, el derecho al careo no es absoluto. Por lo tanto, al amparo de ese estándar, ante la necesidad de adelantar un interés de política pública importante es completamente razonable concluir que el derecho a la confrontación tolera que se afecte **en parte** la capacidad del juzgador de los hechos de observar el *demeanor* de quien testifica en el juicio. Enfatizo que se afecta en parte pues, aunque no pueda apreciar parte de la cara del testigo, el juzgador de los hechos sí tendrá la oportunidad de evaluar otros aspectos de la conducta del declarante. A tenor del dictamen que esbozamos hoy, esta limitación subsistirá mientras esa medida en particular sea necesaria para adelantar el interés público importante de preservar la salud y vida de todas las personas que compulsoriamente participan del procedimiento penal.

B.

El avance de la tecnología ha conferido a los tribunales herramientas importantes que se integran significativamente en la tarea judicial de impartir

justicia. Estas han sido esenciales en circunstancias donde los tribunales se ven imposibilitados de sostener los métodos tradicionales para efectuar su función adjudicativa. En esa línea, distintos tribunales a nivel mundial no han tenido reparos con adoptar el sistema de videoconferencias para celebrar procedimientos judiciales en aquellos casos donde su implementación sea adecuada y no infrinja en los derechos de las personas.[29]

Particular a la controversia ante nosotros, el mecanismo de la videoconferencia permite que un testigo pueda declarar, en tiempo real, sin que tenga que estar físicamente en la misma sala donde se celebra el juicio. Aunque el testigo no estaría presente de manera física, este se encontraría virtualmente presente a través de tecnología que faculta sus interacciones con el resto del componente de la sala. Para ello, los receptores estarían conectados a una plataforma en común que permite que todos puedan verse y escucharse en una comunicación de doble vía. Esto sucede de manera muy similar a como sucedería si el testigo estuviera allí presencialmente.

Al amparo del estándar de Maryland v. Craig, supra, el mecanismo de interrogatorio en el juicio por medio de la videoconferencia de doble vía también provee un método

---

[29] De hecho, previo al estado de emergencia vigente, la Rama Judicial ha dirigido sus esfuerzos a reforzar el uso de las plataformas digitales y la tecnología en aras de promover el acceso a la justicia pronto, costoeficiente y seguro. Entre esas medidas, se ha implementado exitosamente el uso del mecanismo de la videoconferencia para celebrar distintos procedimientos, tanto de naturaleza civil como penal. Véase Oficina de la Administración de los Tribunales, *Guías generales para el uso del sistema de videoconferencia en los tribunales del Estado Libre Asociado de Puerto Rico* (2020).

necesario y adecuado que adelanta el interés público importante de proteger vidas al prevenir la propagación del virus letal COVID-19. En términos generales, por su naturaleza, la videoconferencia permite que una persona pueda participar de un proceso judicial de manera remota, eliminando por completo el riesgo de contagio entre esa persona y el receptor que se encuentre al otro lado de la conexión inalámbrica.

En el contexto de la celebración del interrogatorio a los testigos en la etapa de juicio, al igual que la medida del uso de la mascarilla durante el testimonio presencial, el mecanismo de la videoconferencia permite: (1) que el testigo juramente ante el tribunal antes de emitir sus declaraciones, y (2) que el acusado tenga la oportunidad de contrainterrogar al testigo. Nótese que, distinto a la medida que avalamos en la Opinión mayoritaria, el mecanismo de la videoconferencia permite que el testigo declare sin mascarilla, pues no existe un riesgo de contagio al receptor de la comunicación inalámbrica. Por lo tanto, mediante este método se garantiza la oportunidad de que el juzgador de los hechos pueda evaluar el comportamiento o *demeanor* del testigo en su plenitud.

Ahora bien, la admisibilidad de un testimonio que se ofrece por videoconferencia en un juicio criminal está igualmente sujeta a la jurisprudencia que gobierna el derecho constitucional a la confrontación. Esto pues su uso como medio supletorio supone que el testigo ofrecerá

evidencia ante un tribunal sin estar físicamente presente. Ausente este elemento del derecho a la confrontación, corresponde que se determine antes si, en el contexto del estado de emergencia vigente, el método propuesto asegura la confiabilidad del testimonio que se ofrezca mediante ese mecanismo.

A base de lo anterior, resulta persuasivo que en Maryland v. Craig, supra, el Tribunal Supremo federal validó precisamente esos lineamientos ante unos hechos que involucraban una medida que implementó un sistema análogo a la videoconferencia para cierto tipo de testigos, aunque bajo un interés de política pública importante distinto.[30] De esa forma, varios tribunales inferiores no han vacilado en aplicar el testimonio por videoconferencia de doble vía ante otros intereses de política pública importantes.[31] No

---

[30] Véase H. Perry, *Virtually Face-to-Face: The Confrontation Clause and the Use of Two-Way Video Testimony*, 13 Roger Williams U. L. Rev. 565, 586-587 (2008). Según la autora:

> Two-way video conference testimony in criminal trials is constitutional because it provides the necessary protections and upholds the goals intended by the Confrontation Clause. The procedure is also more protective of defendants' right to confrontation than other accepted methods of testimony […]. Further, two-way video testimony is superior to one-way video testimony, which the Supreme Court has already deemed constitutional.

[31] Véase, por ejemplo, Lipsitz v. State, 442 P.3d 138, 144 (Nev. 2019) (en donde testigo era una víctima que residía en una facilidad de rehabilitación por abuso de sustancias controladas que se encontraba fuera del estado); State v. Seelig, 738 S.E.2d 427, 434-435 (N.C. Ct. App. 2013) (en donde un experto que vivía en otro estado acreditó sufrir de un desorden psicológico severo que le impedia abordar un avión). New York v. Wrotten, 923 N.E.2d 1099, 1100-1103 (N.Y. 2009) (donde se permitió interrogar a un testigo de 85 años con una enfermedad cardiaca severa); Bush v. State, 193 P.3d 203, 214-216 (Wyo. 2008) (donde se permitió el interrogatorio por videoconferencia a un testigo con problemas cardiacos severos, luego de sufrir un fallo renal); State v. Sewell, 595 N.W.2d 207, 212-213 (Minn. Ct. App. 1999) (donde se permitió interrogar por medio de videoconferencia a un testigo en riesgo de sufrir una parálisis total si se movía de donde estaba localizado).

hay razón para creer que deba ser distinto ante el interés al que se contrapone el derecho al careo en la controversia ante nosotros: el derecho a la vida.[32] En particular, la necesidad de atajar una crisis de salud pública tomando medidas que impidan la propagación del COVID-19.

De esa forma, el testimonio que se ofrece por medio de la videoconferencia tiene las ventajas siguientes: (1) provee la oportunidad que tanto el acusado como el testigo puedan verse y comunicarse en tiempo real; (2) permite que se efectúe el contrainterrogatorio; (3) obliga al testigo a ofrecer sus declaraciones bajo juramento, y (4) permite que el juzgador de los hechos observe el comportamiento y el *demeanor* del testigo.[33]

---

[32] Véase, por ejemplo, en el contexto de la pandemia actual, United States v. Donziger, No. 11-CV-691 (LAK), 2020 WL 4747532 (SDNY Aug. 17, 2020):

> [T]he Court notes that depending on the circumstances of the Government's witness, remote testimony may comport with the Sixth Amendment principles set forth in Craig and Gigante. **At least in in some instances, allowing remote testimony may be needed to promote the strong public interest in avoiding exposing at-risk individuals to COVID-19 and minimizing further spread of the virus.** See Craig, 497 U.S. at 850 (finding that the public policy of "protecting child witnesses from the trauma of testifying in a child abuse case" justified an exception to the ordinary "face-to-face confrontation" requirement). **And depending on the witness's situation, the health risks and travel restrictions occasioned by the ongoing pandemic may also constitute "exceptional circumstances" that would permit the use of video testimony.** See Gigante, 166 F.3d at 81-82 (2d Cir. 1999) (finding that witness's illness and participation in a witness protection program were "exceptional circumstances" such that the witness could testify by closed-circuit television).

Íd., pág. 3. (Énfasis suplido).
[33] Véase J. Benjamin Aguiñaga, *Confronting Confrontation in a Facetime Generation: A Substantial Public Policy Standard to Determine the*

A base de lo anterior, no hay impedimento alguno para que pueda celebrarse el interrogatorio en un juicio penal por medio de una videoconferencia de doble vía mientras dure el estado de emergencia actual por motivo de la pandemia que provocó el COVID-19. La medida es necesaria para atender un interés público importante y goza de garantías de confiabilidad suficientes al amparo del derecho a la confrontación.

## IV.

No queda duda de que la preservación de la vida humana dentro del estado de emergencia que enfrentamos constituye un interés público de importancia máxima. Como vimos, el uso mandatorio de mascarillas por parte de los testigos durante todo el interrogatorio adelanta ese interés particular. No obstante, aunque no me opongo al razonamiento que esbozó este Tribunal para justificar el uso de mascarillas en el juicio, entiendo que el mecanismo de la videoconferencia ofrece la alternativa viable, segura y confiable que menos afecta el derecho al careo y mejor protege los intereses en riesgo. Lo anterior, si ese mecanismo se emplea con medidas adicionales dirigidas a garantizar la pureza y confiabilidad del interrogatorio en la etapa de juicio. A modo de repaso, se debe garantizar: (1) la oportunidad que tanto el acusado como el testigo puedan verse y comunicarse efectivamente en tiempo real; (2) permitir que se efectúe el contrainterrogatorio; (3)

*Constitutionality of Two-Way Live Video Testimony in Criminal Trials*, 78 La. L. Rev. 175, 190 (2014).

obligar al testigo a ofrecer sus declaraciones bajo juramento, y (4) la oportunidad de que el juzgador de los hechos pueda observar el *demeanor* del testigo.

V.

Inherente a nuestra función adjudicativa está nuestra facultad de ordenarle al foro primario que celebre los procedimientos judiciales a tenor de nuestros pronunciamientos. Por entender que esta es la forma más segura y confiable de celebrar los interrogatorios en la etapa del juicio, hubiese ordenado la celebración de los interrogatorios en los juicios penales por videoconferencia, conforme a los lineamientos aquí dispuestos. Asimismo, en adelante, permitiría el interrogatorio de manera presencial con el uso de mascarillas —según se dispuso en la Opinión mayoritaria— solo en circunstancias excepcionales que realmente lo ameriten. Correspondería al juez o jueza del foro primario determinar si las circunstancias específicas del caso constituyen causa para prescindir de utilizar el mecanismo de la videoconferencia y realizar el juicio en su totalidad conforme al dictamen que emitió la Mayoría.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Daniel Cruz Rosario<br><br>Recurrido | **Núm.** <u>CC-2020-0250</u> | |

Opinión de Conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 25 de agosto de 2020.

> "Nevertheless, many continued hoping that the epidemic would soon die out and they and their families be spared. Thus they felt under no obligation to make any change in their habits as yet. Plague was for them an unwelcome visitant, bound to take its leave one day as unexpectedly as it had come."
>
> *The Plague,* Albert Camus

> "I have known a vast quantity of nonsense talked about bad men not looking you in the face. Don´t trust the conventional idea. Dishonesty will stare honesty out of countenance, any day of the week, if there is anything to be got by it."
>
> *Hunted Down*, Charles Dickens

Estoy de acuerdo con el resultado al que llega este Tribunal en el día de hoy. De esta manera, se rechaza la determinación del foro apelativo intermedio en este caso de ordenar que el juicio en su fondo "se celebrase de

manera presencial y sin la utilización de mascarilla por parte de los testigos de cargo mientras declaren".[34]

Planteándose en este caso asuntos novedosos en nuestra jurisdicción, he considerado apropiado abordar con calado algunos aspectos que estimo medulares.

## I.

Destaco inicialmente lo obvio: vivimos momentos inéditos en nuestra historia moderna. Ante una realidad tan extraordinaria como la actual, con la rápida y desenfrenada propagación del COVID-19, así como con un contagio comunitario alarmante, la sociedad ha tenido que repensarse y la Rama Judicial no ha sido la excepción.

La Rama Judicial ha adoptado una política pública en la cual se promueve que los asuntos ante los tribunales se atiendan, cuanto más sea posible, mediante el sistema de videoconferencia. Esto, en aras de asegurar la continuidad de los procesos judiciales en el País y, a la vez, salvaguardar la salud de todos los funcionarios que laboran en los tribunales y a la ciudadanía que frecuenta nuestras facilidades.

Para asistirnos en esta importante encomienda, es necesario que los abogados, fiscales y jueces adopten, promuevan y faciliten la implementación de esta política pública, para así evitar -hasta donde sea posible- la

---

[34] *Pueblo de Puerto Rico v. Daniel Cruz Rosario*, KLCE20200037, en la pág. 6, Ap. en la pág. 8.

aglomeración de personas en los tribunales y la propagación de este letal virus.

Mientras dure esta situación excepcional -y en consideración al interés apremiante de proteger la salud y la vida de los ciudadanos- celebrar los juicios y otros procesos judiciales mediante videoconferencia, en aquellos casos que sean más propicios para ello, debe ser una norma imperativa y no una optativa. Ante la existencia de mecanismos alternos que permiten que un juicio se celebre remotamente, no existen razones para poner en peligro la vida y la salud de las personas. No obstante, en aquellos casos que se tramiten de forma presencial, los procedimientos no deben abstraerse de nuestra nueva realidad.

## II.

La Sección 11 de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico dispone que "[e]n todos los procesos criminales, el acusado disfrutará del derecho a ... carearse con los testigos de cargo ...". Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. Asimismo, la Enmienda Sexta de la Constitución de Estados Unidos recoge este principio al establecer que en un proceso criminal todo acusado disfrutará del derecho a confrontar a los testigos que se presenten en su contra. Enmda. VI, Const. EE. UU., LPRA, Tomo 1. El derecho a la confrontación comprende en sí mismo el derecho de todo acusado a carearse o confrontarse

cara a cara con los testigos en su contra; el derecho de éste a contrainterrogar en corte a los testigos en su contra y, finalmente, el derecho a que se excluya prueba de referencia que se pretenda utilizar en su contra como prueba de cargo. *Pueblo v. Santos Santos*, 185 DPR 709, 720 (2012).

El Tribunal Supremo de Estados Unidos en *Mattox v. US*, 156 US 237, 243 (1895) sostuvo que ver al testigo cara a cara, y someterlo a contrainterrogatorio, son los elementos más esenciales de la confrontación. Asimismo, se indicó lo siguiente:

> [t]he primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Id*. en las págs. 242-243.

En *Mattox* se puntualizó, sin embargo, que "general rules of law of this kind, however beneficent in their operation and valuable to the accused, **must occasionally give way to considerations of public policy and the necessities of the case**." *Mattox,* 156 US 243. (Énfasis nuestro).

Poco tiempo después, en *Kirby v. US*, 174 US 47, 55 (1899), el Tribunal Supremo de Estados Unidos expresó que

un hecho que sólo puede ser establecido principalmente por testigos, no puede probarse de otra forma excepto cuando dichos testigos confronten al acusado en el juicio. De esta forma, el acusado los puede observar, tiene derecho a contrainterrogarlos y puede impugnar su testimonio mediante los mecanismos provistos por el ordenamiento jurídico. La confrontación, según el Tribunal, 1) asegura que el testigo declare bajo juramento; 2) obliga al testigo a someterse a contrainterrogatorio; y 3) permite que el adjudicador de los hechos evalúe su credibilidad mediante la observación de su comportamiento mientras declara. *California v. Green*, 399 US 149, 158 (1970). En esa misma línea, en *Lee v. Illinois*, 476 US 530, 540 (1986), el Alto Foro estadounidense expresó que el derecho a confrontar y contrainterrogar a los testigos de cargo contribuye a establecer un sistema en donde prevalezca la verdad y la justicia.

En *Coy v. Iowa*, 487 US 1012 (1988), el Tribunal Supremo de Estados Unidos se enfrentó a una controversia que giraba en torno a si el derecho del acusado a confrontar a sus presuntas víctimas "cara a cara", el cual emana de la Enmienda Sexta, se había violentado. En este caso -durante el testimonio de las víctimas del acusado- se colocó una cubierta frente al acusado para que éstas no tuvieran que verlo mientras testificaban. El Tribunal sostuvo que al acusado se le violentó su derecho a confrontar a los testigos en su contra, pues la cláusula

de confrontación expresamente confería al acusado el derecho de "confrontar cara a cara" a los testigos de cargo. El Tribunal destacó, también, que en este caso no se había ofrecido una razón específica para usar la cubierta, ni se había probado que las testigos necesitaban algún tipo de protección especial. *Id*. en la pág. 1021. Al finalizar la Opinión, el Juez Scalia expresó que -bajo ciertas circunstancias- el derecho de un acusado a carearse con los testigos puede verse limitado. Indicó, específicamente: **"We leave for another day, however, the question whether any exceptions exist. Whatever they may be, they would surely be allowed only when necessary to further an important public policy."** *Id*. (Énfasis nuestro).

Esa ocasión llegó en el año 1990, en *Maryland v. Craig*, 497 US 836 (1990). Allí, durante un juicio criminal, se permitió que la presunta víctima de la acusada -un niño de 6 años- testificara a través de un circuito cerrado de televisión. Ello, con el fin de proteger al niño y evitar que éste sufriera angustias emocionales graves al tener que confrontar y declarar frente a su agresora. El Tribunal Supremo estadounidense sostuvo que, aunque el derecho al careo era un elemento importante del derecho a la confrontación, éste no era indispensable. De esta manera, determinó que -si bien la confrontación cara a cara es preferida- en circunstancias limitadas, los intereses en conflicto pueden justificar

prescindir de ésta. "[W]e cannot say that such confrontation is an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers." *Id*. en las págs. 849-850.

El Tribunal reconoció, sin embargo, que su determinación no significaba que se podía prescindir fácilmente de este requisito de confrontación, sino que debía demostrarse que ello era necesario para promover una política pública importante. ("As we suggested in *Coy*, our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial **only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured**."). *Id*. en la pág. 850. (Énfasis nuestro).

*Maryland* supone, por lo tanto, que el derecho de un acusado a confrontar a testigos de cargo mediante una confrontación física y cara a cara en un juicio puede ceder cuando ello sea indispensable para adelantar una política pública de importancia y así se le haya planteado específicamente al tribunal. Claro está, únicamente cederá si la confiabilidad del testimonio está asegurada. Para hacer tal determinación, el tribunal debe realizar una vista donde se dilucide la procedencia de prescindir con la confrontación física y el careo.

La jurisprudencia que antecede, sin embargo, no toma en cuenta cómo las Ciencias Sociales y la Sicología han ido avanzando en el estudio de la conducta humana. Estos estudios, como veremos, arrojan serias dudas sobre el valor preeminente que una observación momentánea en el fragor de un juicio puede tener al momento de considerar si quien testifica miente o dice la verdad. Porque considero que ello es imprescindible para la recta valoración y el peso a conferirle al *demeanor* al determinar credibilidad, me veo forzada a hacer las siguientes expresiones.

## III.

La controversia ante nuestra consideración estriba, entonces, en determinar si en este momento histórico que vive nuestro País, el uso de una mascarilla por un testigo mientras ofrece su testimonio en un juicio criminal transgrede o no el derecho de todo acusado a confrontar y carearse con los testigos de cargo, según éste emana de nuestra Constitución y de la Constitución de Estados Unidos.

En su dictamen, el Tribunal de Apelaciones concluyó que la respuesta a la interrogante anterior era en la afirmativa, pues razonó que el derecho a la confrontación se violaba por la utilización de la mascarilla ya que ésta impide al juzgador apreciar adecuadamente el *demeanor* del testigo para determinar credibilidad. A esos efectos, ese foro indicó lo siguiente sobre el *demeanor*:

> … comprende la observación de las expresiones faciales, así como corporales, gestos y el comportamiento (*demeanor*) del testigo mientras declara. Estos [] factores no se pueden percibir por el juzgador de los hechos ni por la defensa pues la utilización de una mascarilla oculta los mismos e imposibilita al juzgador contar con todos los elementos necesarios para otorgarle una credibilidad más certera al testigo. [35]

Discrepo de la conclusión a la que llega el Tribunal de Apelaciones respecto el elemento del *demeanor* y cómo la apreciación de éste es determinante en la evaluación y determinación "certera" de credibilidad. Como ya indiqué, es precisamente porque considero imprescindible un análisis riguroso de esta figura que suscribo esta ponencia.

**A.**

Como se señaló y reitero, el foro inferior intermedio concluyó que el uso de mascarillas al testificar no permite apreciar en su completa dimensión el testimonio de un testigo, lo cual afecta la determinación de credibilidad de éste y, por tanto, impide que el juicio sea justo e imparcial al constituirse una violación al derecho a la confrontación.

Huelga señalar que, ínsito a la función de cualquier juzgador de los hechos, se encuentra la facultad de adjudicar credibilidad. Para ello, nuestro ordenamiento procesal adjudicativo propone, entre otras cosas, que se lleve a cabo una evaluación del *demeanor* del testigo,

---

[35] *Pueblo de Puerto Rico v. Daniel Cruz Rosario*, KLCE20200037, en la pág. 5, *Petición de certiorari*, Ap. en la pág. 7.

coetánea a su testimonio. De esta manera, el *demeanor* se percibe como una herramienta imprescindible en el proceso judicial. Esta aseveración, a mi juicio, necesita ciertas matizaciones. Veamos.

Cuando nos referimos al *demeanor*, hablamos del llamado lenguaje corporal o *body language*. Es decir, lo que expresamos de manera inconsciente con la mirada, los gestos, las vacilaciones, la postura, el movimiento de los ojos, el rubor de las mejillas, las manos, etc. Se sostiene que la evaluación de tales señas es indispensable para considerar la veracidad de lo testificado. Véase, Sara Canuso, *Body Evidence*, 17 No. 21 Westlaw Journal Intellectual Property 11 (2011). ("Body language is subconscious, nonverbal communication comprising many elements: diction, posture, eye contact, tone and voice. Bodily signals, in fact, are the most reliable nonverbal signs of honesty or deception.").[36] Véase, además, Allan Pease, *Body Language, How to read other´s thoughts by their gestures,* Manjul Publishing House Pvt Ltd., 2014. Por lo tanto, al observar al testigo, sus gestos le permiten al juzgador de los hechos -sea un juez o un jurado- determinar si el testimonio vertido es sincero o si de éste se desprenden indicios de engaño o falsedad,

---

[36] Para una enumeración de lenguaje corporal, véase S.P.A.R.C., Examples of Body Language, www.deltabravo.net/custody/body.htm (última visita 17 de agosto de 2020).

para así dirimir su credibilidad. El gran jurista norteamericano, Jerome Frank, en su obra *Courts on Trial: Myth and Reality in American Justice*, Princeton University Press, 1949, pág. 21, apuntó:

> All of us know that, in every-day life, the way a man behaves when he tells a story -his intonations, his fidgetings or composure, his yawns, the use of his eyes, his air of candour or of evasiveness- may furnish valuable clues to his reliability.

Este Tribunal se ha expresado en un sentido similar. En *Pueblo v. Rivera Robles*, 121 DPR 858, 869 (1988) sostuvimos que "la forma de hablar, comportamiento, explicaciones, gestos, ademanes y demás detalles perceptibles resultan esenciales para aquilatar adecuadamente la sinceridad de los testimonios". En *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1975), catalogamos el *demeanor* como el instrumento más útil para la investigación de la verdad. Ello estuvo predicado en la idea de que es posible discernir la veracidad o mendacidad de un testigo mediante la observación de su conducta. Esto implica que el juzgador de los hechos debe contrastar el contenido verbal -lo que el testigo dice- con el contenido no verbal, es decir, con la **forma** en que las palabras fueron enunciadas.

De ahí que en nuestro ordenamiento procesal -el cual, como sabemos, sigue el modelo estadounidense- se priorice el testimonio verbal (presencial) en los foros de instancia; que el testigo declare sobre aquello que le consta; que la prueba de referencia (*hearsay*) sea la

excepción y no la regla; y que -en los procesos penales-
el acusado tenga la oportunidad de confrontar los testigos
en su contra. Es por ello, además, que el estándar para
que un foro apelativo intervenga con la determinación de
credibilidad de quien observó y aquilató el testimonio, es
riguroso y exigente, primando la deferencia hacia lo que
dispuso el foro ante el cual se ventiló el caso. Véase,
Olin Wellborn, *Demeanor*, 76 Cornell L. Rev. 1075, 1077
(1991).

Lo cierto es que el juzgador de los hechos tiene a su
disposición una variada panoplia de herramientas que le
permiten aquilatar el testimonio vertido ante sí.
El jurista Robert Fisher nos señala lo siguiente sobre
este particular:

> No-one doubts that by one means or another fact-
> finders must decide who is telling the truth.
> Nor is there any lack of tools to help them in
> their task. The tools include the internal
> consistency of a witness's account; consistency
> with what the witness has said on other
> occasions; comparison with contemporaneous
> records and the other evidence in the case; the
> witness's verbal response when confronted with
> internal and external inconsistencies; the
> witness's general character and credibility
> irrespective of the current dispute; and the
> plausibility of the account given. Plausibility
> entails the need to consider how likely it is
> that people would act in the way the witness has
> suggested. Thus far is reasonably
> uncontroversial.

Robert Fisher QC, *The Demeanour Fallacy*, 4 New Zealand Law
Review (2014).

La Regla 608 de Evidencia, 32 LPRA Ap. VI, sec. 608,
recoge lo expresado por Fisher, al enumerar los medios
mediante los cuales se puede evaluar la veracidad o

mendacidad del testimonio ofrecido por un testigo en corte.[37] En ese contexto, la interrogante recae sobre cómo evaluar el *demeanor* del testigo y su peso al momento de considerar la veracidad del testimonio. Para ello, Fisher nos propone hacer una distinción entre el componente verbal del testimonio y el no verbal, dándole primacía al contenido del testimonio (componente verbal) y relegando a un segundo plano los gestos, es decir, el componente no verbal del testimonio.[38] Su tesis se basa en evidencia

---

[37] La observación del comportamiento de un testigo es sólo uno de los factores a tomar en consideración. Así, nuestro ordenamiento dispone que los siguientes aspectos deben tomarse en consideración al evaluar lo enunciado por el testigo: 1) la naturaleza o carácter del testimonio; 2) la consistencia del testimonio con aquellas declaraciones hechas anteriormente por el testigo; 3) evidencia extrínseca que demuestre que el testigo está prejuiciado de alguna forma, tiene algún interés específico, o está parcializado; 4) si su testimonio contradice otra prueba habida en el expediente del caso; o 5) evidencia del carácter y conducta del testigo en cuanto a su veracidad o mendacidad. Véase Ernesto L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, Ediciones Situm (2016), págs. 200-212.

[38] Fisher lo resume de la siguiente manera:

> The tests begin from the premise that speakers provide two sources of information — verbal and non-verbal. The verbal information is the meaning of the speaker's words. The words can be transcribed as text. Appellate courts and other reviewers can assess the internal consistency, consistency with other evidence, and plausibility, of the text. In evaluating the textual meaning, they are as well placed as those who had been present when the speaker uttered the words in question.
>
> The words used (the verbal content) can be contrasted with the way in which they were uttered (non-verbal content). A speaker simultaneously manifests a package of non-verbal information which is normally subconscious. It consists of facial expressions, bodily movements

científica que revela consistentemente el valor menguado que tienen las señas no verbales de un testigo como evidencia de la veracidad de su testimonio. Fisher, *supra*, en la pág. 22 ("Social scientists have known about the *demeanour* fallacy for well over 40 years.  Although it has taken longer for the news to reach lawyers…").

En igual sentido, el profesor Wellborn nos indica, citamos extensamente:

> Psychologists and other students of human communication have investigated many aspects of deceptive behavior and its detection. As part of this investigation, they have attempted to determine experimentally whether ordinary people can effectively use nonverbal indicia to determine whether another person is lying. In effect, social scientists have tested the legal premise concerning demeanor as a scientific hypothesis. **With impressive consistency, the experimental results indicate that this legal premise is erroneous. According to the empirical evidence, ordinary people cannot make effective use of demeanor in deciding whether to believe a witness. On the contrary, there is some evidence that the observation of demeanor diminishes rather than enhances the accuracy of credibility judgments.**
>
> The credibility of a witness's testimony depends upon more than the witness's honesty. A sincere witness may innocently convey inaccurate information as a result of an error of perception or memory. Therefore, a trier's overall evaluation of a particular witness may include appraising the validity of the witness's beliefs as well as deciding whether the witness intends to tell the truth. Do the appearance and nonverbal behavior of a witness help the trier to judge the accuracy of the witness's beliefs? On this issue as well, substantial experimental

---

> and vocal characteristics.  The vocal characteristics, or "paralinguistic cues", include pitch, pace, volume, timbre, expression and tremors.  It is this package of face, body and voice that lawyers describe as "demeanour."

Fisher, en la pág. 3.

evidence suggests that they do not.

Wellborn, *supra,* en la pág. 1075. (Énfasis nuestro).

Curiosamente, hace casi sesenta años, este Tribunal con gran previsión advertía sobre la sobreestimación de la evidencia de conducta, el *demeanor*, para determinar mendacidad. Así, en *Sanabria v. Sucn. González*, 82 DPR 885, 993-994 (1961), este Tribunal, por voz de don Emilio Belaval, indicó:

> Con los conocimientos que tenemos hoy de psicología aplicada, sabemos que es altamente improbable estudiar a través de una observación tan rápida, en circunstancias tan poco deseables como la que brinda un juicio sobre los hechos, la conducta moral de un testigo. Sálvese por algún tiempo el ingenuo muestrario de los indicios expresionales coleccionado por la experiencia de cada juez de hechos, **para buscar la verdad a través de esa curiosa revelación plástica de la credibilidad que se supone pueda reflejarse sobre la figura humana. Confieso que mi experiencia de diez años como juez de hechos, lo que me produjo fue una duda profunda sobre la eficacia del método.** Para una crítica de la evidencia de conducta (demeanor evidence) véase el caso de <u>National Labor Relations Board v. Dinion Coil Co., 201 F.2d 484 (Frank)</u> (1952), cita precisa a las págs. 487-490. (Énfasis nuestro).

Lo que advertimos en *Sanabria v. González*, es lo que se conoce hoy día como la Psicología del Engaño (*Psychology of Deception*), que plantea la interrogante de si es posible que un observador común o no entrenado pueda discernir si una persona miente y, si éste puede, entonces ¿cómo lo hace? Para ello, se vale de tres categorías del lenguaje no verbal o *demeanor*, a saber: la voz, los gestos y la expresión del rostro. Estas claves se conocen como las claves paralingüísticas. Wellborn, *supra*, en la pág.

1080.     Véase,    además,    Hocking,    Bauchner,    Kaminski    &
Miller,    *Detecting   Deceptive   Communication   from   Verbal,
Visual   and   Paralinguistic   Cues*,   6   Hum.   Comm.   Res.   33,   34
(1979),   citado   en   Wellborn,   *supra*.

Estos   estudios   sugieren   que   la   relación   que   existe
entre   el   contexto   en   el   que   ocurre   un   juicio,   el
contrainterrogatorio,   la   preparación   del   testigo   y   el
proceso   deliberativo   no   se   ve   afectada   positivamente   por
las   señales   no   verbales.    Por   el   contrario,   la   relación
entre   estos   elementos   tiende   a   disminuir   la   utilidad   de   la
conducta   no   verbal   al   momento   de   dirimir   credibilidad.    Se
señala   que   el   interrogatorio   y   el   contrainterrogatorio,
por   ejemplo,   pueden   causar   tanta   tensión   o   ansiedad   al
testigo,   que   su   conducta   no   verbal   se   puede   interpretar
como   fingida   o   engañosa   (*deceptive   behavior*).[39]    Este
fenómeno   se   conoce   como   el   "Error   de   Otelo",   pues   nos
recuerda   cómo   Otelo   malinterpretó   la   angustia   de   Desdémona
al   acusarla   de   infidelidad.   Kelly   Harrison,   *Forensic
Interviewing*,   Kindle   ed.,   en   la   pág.   76.    El   profesor
Ekman,   lo   define   de   la   siguiente   manera:   "This   error
occurs   when   the   lie   catcher   fails   to   consider   that   a
truthful   person   who   is   under   stress   may   appear   to   be
lying.   [...]   Truthful   people   may   be   afraid   of   being
disbelieved…."   Paul   Ekman,   *Telling   Lies,   Clues   to   Deceit
in   the   Marketplace,   Politics   and   Marriage,*   Kindle   ed.,

---

[39] Paul Ekman, *Detecting Deception from the Body or Face*, 29 J. Personality & Soc. Psychology 288 (1974). Véase, además, Paul Ekman, *Telling Lies, Clues to Deceit in the Marketplace, Politics and Marriage,* Kindle ed.

pág. 170. De esta manera, los efectos fisiológicos y espontáneos que la carga que representa para un testigo estar sentado en una silla testifical en un ambiente adversativo e inminentemente tenso, pueden erróneamente considerarse como prueba inequívoca de la falsedad del contenido de su testimonio. De lo que antecede se desprende que este Tribunal en *Sanabria* estaba en lo correcto cuando advertía sobre la falacia del *demeanor,* sobre la poca confiabilidad del lenguaje corporal.

Finalmente, el profesor Ekman nos señala también lo siguiente sobre las dificultades de determinar acertadamente que una persona dice la verdad: "[o]ur research, and the research of most others, has found that few people do better than chance in judging whether someone is lying or truthful. We also found that most people think they are making accurate judgments even though they are not." Ekman, *supra*, pág. 189. No es irrazonable concluir entonces que, si una persona común no puede de manera certera interpretar los indicios o señas del lenguaje no verbal, es poco probable que un grupo deliberativo que observa ese lenguaje, como los miembros del jurado, lo pueda hacer de forma certera. Wellborn, *supra*, en la pág. 1081.

**IV.**

Retomo en este momento el escepticismo de hace casi seis décadas sobre el valor que se le debe conferir al comportamiento no verbal de un testigo -el *demeanor*- al

momento de considerar si éste es mendaz o veraz y adjudicar credibilidad. Y la respuesta a la que llego con base en evidencia científica, es que este tipo de observación debe ser sólo un elemento más en esa determinación del juzgador y no debe tener un peso concluyente. Toda vez que el análisis del foro apelativo intermedio se fundamenta en la primacía del comportamiento no verbal en la evaluación de un testimonio y es categórico en cuanto a cómo el uso de una mascarilla violenta el derecho a la confrontación de un acusado, precisamente porque afecta la apreciación del lenguaje corporal, procede revocar ese dictamen. ¿O es que consideramos que los jueces o abogados no videntes no pueden participar en un juicio criminal porque ello violaría el derecho a confrontación que le asiste al acusado?

Por otro lado, y como ya vimos, el derecho de un acusado a carearse con los testigos de cargo admite variaciones y excepciones en su aplicación. Éstas, a su vez, responden a situaciones particulares que exigen que se haga un balance entre el derecho del acusado a confrontar los testigos en su contra y consideraciones de política pública. La situación extraordinaria que impera al presente en nuestro País y en el resto del mundo milita en contra de adoptar irreflexivamente interpretaciones absolutistas del derecho a la confrontación. Un análisis que se adhiere a un balance de los intereses en pugna nos

obliga a concluir que el derecho constitucional de un acusado cede ante el interés de evitar contagios en las salas de nuestros tribunales. Esto es así porque, aunque es nuestro deber garantizar el ejercicio de los derechos constitucionales de los cuales es acreedor todo acusado, salvaguardar la salud de la población contra un virus mortal es, también, nuestra responsabilidad como administradores de la justicia.

En virtud de que el derecho de todo acusado a confrontar los testigos en su contra no es absoluto, su protección e interpretación debe darse, necesariamente, en el debido contexto. A pesar de que las mascarillas podrían representar un inconveniente en la apreciación del *demeanor* de una persona, ciertamente -y según dispone nuestro ordenamiento procesal y probatorio- subsisten mecanismos y elementos esenciales que permiten ejercer efectivamente el derecho a la confrontación y aseguran la confiabilidad de los testimonios. De otra parte, el inconveniente que podría representar el uso de las mascarillas se limita únicamente a un componente de los distintos elementos que permiten dirimir la credibilidad de un testigo y cuyo peso no es concluyente. Como se discutió, estos elementos trascienden la conducta no verbal exhibida en corte.

Concluyo con una última reflexión. Kelsen, en su *Teoría Pura del Derecho*, nos advirtió que el Derecho no es "norma y solo norma". Hans Kelsen, *Teoría Pura del*

*Derecho*, Universidad Nacional Autónoma, México, 1981, pág. 33.    Necesariamente, en su esencia, el Derecho refleja los valores sociales, políticos, culturales, económicos, así como los valores morales y de conducta de una sociedad determinada. En otras palabras, el Derecho es una construcción social y a la misma vez, un elemento de esa realidad.    Ya lo decían los antiguos romanos: *Ubi societas, ibi ius;* donde hay sociedad, hay derecho.

La interacción entre esos valores sociales y el Derecho implica que este último se debe convertir en un instrumento que concretice los cambios y las transformaciones sociales.    Cambios que, como sabemos, siempre preceden la norma escrita.    En ese devenir, en nuestra función como intérpretes del Derecho, no podemos estar ajenos a lo que a nuestro alrededor ocurre.    Siendo ello así, y considerando los estudios de la conducta humana que consistentemente demuestran el poco valor probatorio que tiene la observación del lenguaje no verbal de un testigo al momento de determinar si éste es mendaz, reitero que exigir que un testigo no use mascarilla para testificar porque impide esa "lectura u observación" no solo es improcedente, sino equivocado.    Más aun, en tiempos de pandemia.

Anabelle Rodríguez Rodríguez

Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario


      v.

                        CC-2020-0250

Daniel Cruz Rosario

    Recurrido


Opinión Disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES.


En San Juan, Puerto Rico, a 25 de agosto de 2020.


      Disiento respetuosamente de la Opinión que suscribe una mayoría de este Tribunal. Los derechos constitucionales no se suspenden por razón de una emergencia. No abusó de su discreción el foro primario que, conforme a la sentencia del Tribunal de Apelaciones, emitió una orden mediante la cual realizó un balance de intereses justo y adecuado, y tomó las medidas cautelares para salvaguardar los derechos del acusado y la salud de los funcionarios judiciales, los representantes legales, los testigos y del propio acusado.

I.

El 21 de noviembre de 2019, el Ministerio Público presentó una denuncia contra el Sr. Daniel Cruz Rosario, por el delito menos grave tipificado en el Art. 178 del Código Penal de 2012 (intrusión en la tranquilidad personal).

Entonces, el 16 de junio de 2020, el Tribunal de Primera Instancia emitió una Resolución mediante la cual señaló la Vista del Juicio para atender un cargo menos grave en contra del Sr. Cruz Rosario. El foro de instancia promovió el uso del sistema de videoconferencias de la Rama Judicial para la celebración de la vista. No obstante, el recurrido se opuso y solicitó que el juicio se celebrara presencialmente. Afirmó que su derecho constitucional al careo o a la confrontación requiere la celebración de una vista presencial, sin la utilización de mascarillas por parte de los testigos.

Además, solicitó que no se permitiera a los testigos declarar con mascarillas protectoras dado que esto vulneraba su derecho de confrontar a los testigos de cargo. Para él, ese derecho acarrea que los testigos declaren sin ningún objeto en la cara. Basó su argumento en que la mascarilla le impide al juzgador observar el "demeanor" del declarante y aquilatar adecuadamente su credibilidad. Así, sostuvo que, si el tribunal no tomaba las medidas correspondientes, se violentaría su derecho a la confrontación.

El Tribunal de Primera Instancia declaró no ha lugar la moción presentada por el señor Cruz Rosario. Inconforme, este acudió al Tribunal de Apelaciones, el cual revocó la determinación del foro primario. Arguyó que el derecho a la confrontación comprende la observación del comportamiento del testigo y que el uso de mascarillas impide al juzgador de hechos contar con todos los elementos necesarios para otorgarle credibilidad más certera al testigo. Según la defensa, la mascarilla oculta los gestos, expresiones faciales y puede alterar el tono de voz del testigo. Concluyó que procedía la celebración del juicio presencialmente y sin que los testigos usen mascarillas protectoras.

Para cumplir con la sentencia del Tribunal de Apelaciones, el Tribunal de Primera Instancia emitió una orden el 10 de julio de 2020, en la que expuso lo siguiente:

> **La celebración de juicio en su fondo conllevará la utilización de dos (2) salones de sesión,** ambos ubicados en el piso cuatro (4) del Centro Judicial.
>
> …
>
> Cabe mencionar que ambos salones se encuentran suficientemente equipados con el equipo audiovisual adecuado para que el/la Juez que presida observe los procedimientos que se estarán ventilando en la sala aledaña, muy similar a los procedimientos que se llevan a cabo con el sistema de circuito cerrado.
>
> **En una de las salas permanecerá el/la Juez y la(s) secretarias de sala. En la segunda sala permanecerá la Defensa, ella alguacil/alguacila de sala y el Ministerio Público.** [El/la Fiscal encargado/encargada del caso puede optar por permanecer en cualquiera, pero no ambas, de las salas que se utilizarán para los procedimientos de epígrafe.] **Los testigos de cargo declararán en esa segunda sala.**

>   **El Centro Judicial facilitará** *face shields* **a los/las testigos de cargo para que sean utilizados en todo momento.**

>   El/la Juez decretará un receso con la conclusión de cada testimonio de cargo, **a fin de llevar a cabo una desinfección de esa segunda sala, para el beneficio de todas las partes allí presentes.** Apéndice Certiorari pág. 37-38 (énfasis suplido).

Sin embargo, inconforme con la decisión del Tribunal de Apelaciones, el 29 de julio de 2020 el Ministerio Público presentó ante nos un recurso de *certiorari* y una moción en auxilio de jurisdicción. El 31 de julio de 2020, una mayoría de este Tribunal declaró ha lugar la referida moción y se expidió el auto solicitado.

II.

Uno de los derechos fundamentales que se le reconoce a toda persona que enfrenta una acusación en su contra es el derecho a ser juzgado siguiendo el proceso establecido en ley. Pueblo v. Pagán Rojas, 187 DPR 465, 478 (2012). Este derecho se encuentra consagrado en las Enmiendas V y XIV de la Constitución de Estados Unidos, así como en la Sección 7 del Articulo II de la Constitución de Puerto Rico, LPRA Tomo 1. Véase Pueblo v. Pagán Rojas, Íd.

En su vertiente procesal, "el debido proceso de ley impone al Estado la obligación de garantizar a los individuos que cualquier interferencia con sus intereses de propiedad o libertad se hará a través de un procedimiento que será justo y

equitativo". <u>Pueblo v. Pagán Rojas</u>, <u>supra</u>, en la pág. 479. (Citas omitidas). Para reclamar válidamente un debido proceso de ley, deberá existir un interés individual de propiedad o libertad que pueda verse afectado por la intervención del Estado. <u>Íd</u>.

El derecho a un juicio justo o imparcial emana de la cláusula de debido proceso de ley. Se trata del derecho del acusado a un juicio con las garantías procesales que cobijan al acusado. E.L. Chiesa Aponte, <u>Procedimiento Criminal y la Constitución: Etapa adjudicativa</u>, San Juan, Ed. Situm, 2018, pág. 54. En las palabras del profesor Ernesto Chiesa, "cabe decir que se viola el debido proceso de ley cuando se le niega al acusado un derecho procesal que se le reconoce". <u>Íd</u>.

III.

Entre las garantías procesales que la Constitución de Estados Unidos reconoce está el derecho a la confrontación en los procesos criminales. Enmda. VI, Const. EE.UU.A., LPRA, Tomo 1. Por su parte, la Sección 11 del Artículo II de la Constitución de Puerto Rico consagra el derecho de todo acusado a "carearse con los testigos de cargo". Art. II, Sec. 11, Const. PR, LPRA, Tomo 1. Estas disposiciones se conocen como Cláusulas de Confrontación.

En <u>Pueblo v. Pérez Santos</u>, 195 DPR 262, 269-270 (2016), establecimos que del derecho a la confrontación emanan tres garantías fundamentales, a saber: (1) el derecho del acusado de confrontar cara a cara los testigos adversos, (2) el derecho a contrainterrogarlos y, (3) el derecho a que se excluya cierta

prueba de referencia. La primera garantía es lo que conocemos como el derecho al careo. Este derecho constitucional opera en la etapa del juicio. Chiesa Aponte, op. cit., pág. 61. Por lo tanto, no cabe hablar de este derecho en la vista de causa probable para arresto o en la vista preliminar. Íd. A estos efectos, el Tribunal Supremo Federal ha expresado: "The right to confrontation is basically a trial right. It includes **both** the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness." Barber v. Page, 390 US 719,725 (1968) (énfasis nuestro).

En Coy v. Iowa, 487 US 1012, 1018-1021 (1988), el Tribunal Supremo Federal reconoció que el derecho al careo es fundamental ya que contribuye a un sistema justo de procedimiento criminal y, por tanto, no podemos prescindir ligeramente de este. Como dice el profesor Ernesto Chiesa: "[s]u fundamento es muy sencillo: es más fácil decir algo contra una persona cuando esta no está presente; es más difícil hacerlo de frente". Ernesto L. Chiesa Aponte, Derecho procesal penal, 81 Rev. Jur UPR 373, 380 (2012).

Por su parte, en Maryland v. Craig, 497 US 836, 845 (1990) se estableció: *"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."* En ese caso, el Alto Foro identificó el *demeanor*, es decir el comportamiento del declarante, como uno de los "elementos de la confrontación." Íd. (traducción nuestra) A través de este, el

juzgador puede determinar "si un testigo es digno de credibilidad". Íd. (traducción nuestra).

De hecho, estableció que el derecho garantizado por la Cláusula de Confrontación incluye no solo un "examen personal", sino también que (1) el testigo declarará bajo juramento, para reducir la posibilidad de que mienta al someterlo a la penalidad por perjurio; (2) habrá derecho a contrainterrogarlo; y (3) que el juzgador de hechos decidirá luego de observar el comportamiento de los testigos, para que tenga la oportunidad de aquilatar su credibilidad. En palabras del Tribunal Supremo federal, el derecho a la confrontación tiene las características siguientes:

> *(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3)* **permits the jury that is to decide the defendant's fate to observe the _demeanor_ of the witness in making his statement, thus aiding the jury in assessing his credibility.** Maryland v. Craig, supra, págs. 846-847 (énfasis nuestro) (citas omitidas).

Al respecto, hemos mencionado que para aquilatar adecuadamente la sinceridad y credibilidad de los testimonios es importante observar "las expresiones mímicas: el color de las mejillas, los ojos, el temblor o la consistencia de la voz, los movimientos, el vocabulario no habitual", entre otros aspectos. Ortiz v. Cruz Pabón, 103 DPR 939, 947 (1975).

Como vemos, uno de los aspectos fundamentales del derecho a la confrontación es que le permite al juzgador de los hechos

(juez o jurado), quien en última instancia decide sobre la libertad del acusado, observar el comportamiento (*demeanor*) del testigo mientras este presta su testimonio. Esa observación es crucial para que el juzgador evalúe la credibilidad del declarante.

Asimismo, en Dutton v. Evans, 400 US 74 (1970), el Tribunal Supremo federal expresó que la Cláusula de Confrontación busca garantizar que el juzgador de hechos tenga una base satisfactoria para evaluar si los testigos dicen la verdad: "*[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the [testimony]*". Íd., pág. 89.

Hay quienes ponen en duda siglos de jurisprudencia sobre la importancia del *demeanor* en el proceso de aquilatar la credibilidad de los testigos. Citan estudios de expertos en conducta humana que cuestionan cuán certeros somos los seres humanos al evaluar los gestos y la conducta de otras personas. Sin embargo, obvian que, a fin de cuentas, determinar si el *demeanor* influye (o no) a la hora de evaluar la veracidad de lo que un testigo dice, es un asunto de apreciación que corresponde al juzgador de los hechos, no a nosotros.

Ahora bien, esto no significa que el derecho al careo es absoluto. En Maryland v. Craig, supra, en la pág. 850, el Tribunal Supremo federal expresó que "el derecho del acusado a confrontar a los testigos adversos puede satisfacerse en

ausencia de una confrontación física o careo en el juicio solo cuando ello sea necesario para adelantar una política pública importante y solo cuando la confiabilidad del testimonio esté garantizada de otra manera". (traducción nuestra).[40] En este caso, el Tribunal Supremo permitió el testimonio de un menor víctima de abuso bajo el sistema de circuito cerrado. El Tribunal entendió que "el bienestar físico y emocional del menor víctima de abuso es lo suficientemente importante para limitar, en casos apropiados, el derecho del acusado a "carearse" con el testigo de cargo". Chiesa Aponte, op. cit., pág. 86.

Como vemos, en nuestro sistema constitucional, mientras existan medidas menos onerosas que protejan el interés público, no cabe hablar de un juicio mediante videoconferencia. Esa debe ser la última alternativa. Como explica el profesor Chiesa, "[p]ara emplear estos procedimientos especiales que limitan el derecho a la confrontación, es necesario que previamente el tribunal haga unas determinaciones específicas, **caso a caso**, sobre la necesidad de apartarse del modo usual de testificar frente al acusado". Íd. (énfasis nuestro). Este derecho es tan esencial que, para cada uno de estos casos, el tribunal debe realizar una vista para dilucidar la procedencia de prescindir con la confrontación física y el careo. De ahí surge lo que conocemos como la "vista de necesidad". Íd. Por lo tanto, no

---

[40] "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Maryland v. Craig, supra, en la pág. 850.

podemos hablar de juicios por videoconferencias "al por mayor", sin realizar un análisis caso a caso.

IV.

En este caso, la controversia central no es exclusivamente sobre el derecho a la confrontación. Va más allá. Se trata de si le estamos garantizando el derecho a un juicio justo a un acusado. La defensa plantea que requerir el uso de mascarillas por parte de los testigos de cargo, le impide conducir eficazmente el contrainterrogatorio e imposibilita al juzgador de los hechos evaluar satisfactoriamente la credibilidad del testigo. El efecto de esto tiene una consecuencia directa sobre la libertad del acusado.

El juicio va dirigido a la búsqueda de la verdad. Así, el debido proceso de ley no solo garantiza los derechos a la persona acusada, sino que obliga a los funcionarios del Estado a actuar correctamente para garantizar que se haga justicia.

Indudablemente, durante una emergencia, en beneficio del bien común y la salud pública, se pueden tomar medidas que alteren cómo se conducirán los juicios penales. El objetivo de estas medidas es proteger la salud de todos los individuos que participan en el proceso. Sin embargo, estas medidas tienen que garantizar a todas las personas imputadas de delito que la interferencia con sus intereses de libertad se hará a través de un procedimiento justo.

Precisamente, ese balance de intereses fue lo que llevó al Tribunal de Primera Instancia a emitir la orden de 10 de julio de 2020, en la cual tomó medidas de precaución sanitaria para la celebración del juicio en su fondo. La Opinión del Tribunal omite mencionar esa Orden y, por ello, no realiza ningún análisis de sus disposiciones a la luz de los intereses en juego.

Cuando analizamos el contenido de la orden nos percatamos de que el foro primario tomó todas las salvaguardas para garantizar el interés público de proteger la salud de los abogados, el acusado, testigos y personal del tribunal. Ello se hizo sin violentar el derecho del acusado a un juicio justo, pues el juzgador de los hechos podrá aquilatar la credibilidad del testigo libre de barreras - como lo es el uso de la mascarilla. Eso le permitirá apreciar todas las expresiones faciales del testigo, mientras declara.

En específico, las medidas que el foro primario adoptó fueron: la disposición de dos salas –una para la juez y otra para las partes y los testigos de cargo- equipadas con un sistema audiovisual para la comunicación entre ellas. Para los testigos se proporcionarán caretas transparentes (*face shields*), que usarán mientras testifican. Cuando no estén testificando, deberán usar mascarillas, igual que el resto de las personas presentes en sala.

Como podemos ver, el foro primario, dentro de su discreción y en armonía con los intereses involucrados, adoptó medidas salubristas para proteger a los presentes. A la vez,

salvaguardó el derecho del acusado a que el juzgador de los hechos pueda percibir el comportamiento (*demeanor*) de los testigos y aquilatar así su credibilidad. El uso del *face shield* transparente por el testigo, mientras declara, permite al juzgador de los hechos apreciar su cara mientras declara y a la vez protege a los presentes, al reducir el alcance de las partículas de saliva que el testigo pueda expedir. Junto a las medidas de distancia bajo las cuales declarará el testigo, esto protege la salud de todos los presentes en el juicio.

Por otro lado, el uso de la mascarilla incide sobre la facultad del juzgador para aquilatar la credibilidad del declarante. La mascarilla no permite observar si el testigo hace muecas con su boca o si sus cachetes enrojecen. La mascarilla también puede incidir sobre el volumen o la claridad de la voz del testigo, o causarle picor o hiperventilación y hacer que sude. Esto podría repercutir negativamente en la percepción del juzgador sobre la veracidad del declarante. En fin, para pasar juicio, el juzgador debe poder ver la cara completa del testigo y no solo la mitad.

De hecho, el Centro para el Control y Prevención de Enfermedades, o *Centers for Disease Control and Prevention* (CDC), reconoce que hay ocasiones en las que no es factible usar una mascarilla sino una careta transparente o *face shield*. En lo pertinente, el CDC expresa: "Masks are a critical preventive measure and are **most** essential **in times when social distancing is difficult**". Luego añade: "**if masks cannot be used, make sure to take other measures to reduce the risk of COVID-19 spread,** including social distancing, frequent hand

washing, and cleaning and disinfecting frequently touched surfaces". Coronavirus Disease 2019 (COVID-19): Considerations for Wearing Masks, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html (Énfasis suplido) (última visita 21 de agosto de 2020).

Además, el CDC ha provisto recomendaciones para la utilización correcta de los *face shields* cuando no es factible (*not feasible*, en palabras del CDC) la utilización de las mascarillas. En lo pertinente, el CDC ha expresado:

> *the available data suggest that the following face shields may provide better source control than others:*
>
> *Face shields that wrap around the sides of the wearer's face and extend below the chin.*
>
> *Hooded face shields.*
>
> *Face shield wearers should wash their hands before and after removing the face shield and avoid touching their eyes, nose and mouth when removing it.*
>
> *Disposable face shields should only be worn for a single use and disposed of according to manufacturer instructions.*
>
> *Reusable face shields should be cleaned and disinfected after each use according to manufacturer instructions or by following CDC face shield cleaning instructions.*
>
> *Coronavirus Disease 2019 (COVID-19): Considerations for Wearing Masks, CDC,* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html#face-shields (última visita 21 de agosto de 2020).

Por otro lado, contrario a lo esbozado por la Opinión del Tribunal, no se estableció el uso del *face shield* como un

sustituto de la mascarilla, pues el testigo la estará utilizando en todo momento, excepto cuando esté declarando. Se utiliza en esa ocasión limitada pues no es factible el uso de la mascarilla sin violentar el derecho del acusado a un juicio justo.

Cuando analizamos las medidas que adoptó el foro primario con las recomendaciones del CDC, es forzoso concluir que este foro actuó correctamente y que este Tribunal se está extralimitando al requerir de manera **absoluta** el uso de la mascarilla mientras un testigo declara, en violación del derecho a un juicio justo que tiene el acusado. El foro primario, dentro de su sana discreción y salvaguardando todos los intereses en juego, ordenó el uso del *face shield* por el testigo **solo** mientras declara. Tanto la defensa como el Ministerio Público tienen que estar a más de seis pies de distancia y están obligados a tener puesta la mascarilla en todo momento. Culminado el testimonio del testigo, este viene **obligado** a ponerse de nuevo su mascarilla y se procederá a desinfectar toda el área. Bajo este mismo análisis, en este caso no cabe hablar de un juicio mediante videoconferencia. El tribunal tomó las medidas necesarias para salvaguardar los intereses públicos involucrados y la confiabilidad de los testimonios.

Es por lo anterior que sostengo que las medidas adoptadas por el foro inferior son más que razonables y hacen el balance adecuado entre un juicio justo y la protección sanitaria de los presentes.

Surge de la propia orden que esas medidas se tomaron en armonía con la Circular Núm. 21 de la Oficina de Administración de los Tribunales del 20 de mayo de 2020, conocida como el Plan de Contingencia y Control de Exposición y Propagación del Covid-19 de la Rama Judicial. Este plan atiende todo lo relacionado a la protección del personal de la Rama Judicial y del público en general, a través de las rutinas de limpieza y desinfección de las facilidades. Establece, entre otras cosas, el uso compulsorio de mascarillas en el área de trabajo en todo momento, medidas amplias de distanciamiento social, que los micrófonos y audífonos se cubrirán con material desechable o que, en la alternativa, se desinfectarán antes y después de utilizarse.

Así, es importante destacar que mientras el testigo de cargo preste su declaración con una careta transparente (*fase shield*), los abogados, los miembros del ministerio público, el acusado y el personal del tribunal tienen que estar a más de seis pies de distancia y tener puestas las mascarillas. ¿Acaso eso no es razonable? El Tribunal no puede afirmar que hubo abuso de discreción. Entonces, ¿por qué interviene con la discreción del foro primario y entra a micromanejar un juicio? Hasta decidimos qué tipo de mascarilla es la que se va a usar.

El COVID-19 es una amenaza a la salud. Por eso hay que tomar medidas para proteger de ese virus a los participantes en el proceso judicial. Sin embargo, el miedo no puede guiar nuestras decisiones. Lamentablemente, este Tribunal ignoró el derecho del acusado a un juicio justo y, al implantar una regla absoluta sobre el uso de las mascarillas por los testigos, no

hizo un balance justo y razonable que atienda todos los intereses involucrados.

V.

Por estas razones, disiento respetuosamente de la decisión del Tribunal. No abusó de su discreción el foro primario. Conforme al mandato del Tribunal de Apelaciones, se adoptaron las medidas cautelares adecuadas para proteger la salud de todos y, simultáneamente, salvaguardar el derecho del acusado a tener un juicio justo. Ante eso, nuestra intervención es innecesaria.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Daniel Cruz Rosario<br><br>Recurrido | CC-2020-0250 | Certiorari |

Opinión disidente emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 24 de agosto 2020.

Como es conocido, atravesamos como sociedad una pandemia mundial que ha trastocado todos los aspectos de nuestras vidas. Hoy nos enfrentamos a uno de los múltiples efectos del COVID-19, el cual se ha visto reflejado en la celebración de los procedimientos judiciales. A esos fines, los tribunales se han visto en la obligación de proveer e implantar medidas de seguridad en aras de prevenir y evitar el contagio del COVID-19. Entre éstas, se encuentran medidas como el uso de mascarillas, el uso de "face shields" y la transmisión mediante videoconferencia.

Ante esta nueva realidad, hoy debemos analizar estas medidas salubristas en el contexto particular de un procedimiento criminal. Específicamente, debemos auscultar si tales medidas laceran el derecho constitucional a la confrontación que cobija a toda persona acusada de delito.

Ello, nos obliga a realizar un delicado balance de intereses entre el interés apremiante del Estado de proteger la salud de todas las personas presentes en un juicio criminal y el derecho de toda persona acusada a carearse con los testigos de cargo.

Precisamente, por considerar que pudo haberse logrado un balance de intereses más adecuado, me veo obligado a disentir de la Opinión mayoritaria. Como puede apreciarse, este Tribunal resuelve, de manera **absoluta**, que toda persona que testifique en un procedimiento criminal deberá hacerlo físicamente con una mascarilla en su rostro. Lo anterior, al resolver que el derecho al careo de la persona acusada se subsana con otras garantías del proceso, tal como el derecho al contrainterrogatorio.

Ciertamente, entiendo necesario y meritorio que los foros primarios implanten ciertas medidas para proteger la salud de todas las personas presentes. Ante esa realidad, soy del criterio que este Tribunal debió explorar otras alternativas que afecten de manera menos onerosa el derecho al careo. La transmisión por videoconferencia, por ejemplo, sí permite que la persona testifique sin uso de mascarilla, garantizando así su seguridad y la prevención del contagio. Asimismo, permite que la persona acusada pueda apreciar las expresiones faciales de quien testifica, lo cual es más protector del derecho a la confrontación.

Sin embargo, una Mayoría de este Tribunal descarta mecanismos menos onerosos y opta por automáticamente reconocer

el uso de una mascarilla, sin sopesar que es una de las opciones más drásticas y que más lacera el derecho de una persona acusada a carearse con la persona que testifica en su contra. En ese sentido, la mascarilla limita significativamente la capacidad de observar el "demeanor" y las expresiones faciales de la persona que testifique, por lo que no debió adoptarse como la primera y única opción.

De igual modo, lo pautado en la Opinión mayoritaria está enmarcado en una apreciación errónea y no actualizada en torno al derecho a carearse con los testigos de cargo. Tal como lo ha dispuesto la Corte Suprema de los Estados Unidos, debimos adoptar mecanismos en reconocimiento de que el derecho al careo es **esencial** a todo procedimiento criminal. Por tanto, éste no se subsana meramente por el hecho de que la persona acusada tendrá derecho a contrainterrogar a la persona que testifica en su contra. Al contrario, el derecho a la confrontación exige esfuerzos razonables de parte de este Tribunal para implantar alternativas que no laceren sus propósitos y objetivos.

Por tales fundamentos, respetuosamente disiento. Veamos el derecho aplicable a la controversia ante nos.

**I.**

En nuestro ordenamiento, las personas acusadas de delito están cobijadas por una gama de derechos y protecciones con el propósito de garantizar que el procedimiento criminal en su contra sea justo y digno. Entre éstas, se encuentra el derecho constitucional a confrontar los testigos que presente el

Ministerio Público en su contra. Art. II, Sec. 11, Const. PR, LPRA, Tomo 1. Tal protección se encuentra igualmente en la Sexta Enmienda de la Constitución de los Estados Unidos. Emda. VI, Const. EE.UU., LPRA, Tomo 1.

El derecho a la confrontación se materializa en tres (3) corolarios importantes: (1) el **derecho a carearse** con los testigos de cargo; (2) el derecho a contrainterrogar a dichos testigos, y (3) el derecho a que se excluya cierta prueba de referencia. Pueblo v. Pérez Santos, 195 DPR 262, 269-270 (2016). Así, la primera vertiente del derecho al careo le garantiza a la persona acusada la oportunidad de confrontar cara a cara los testigos presentados por el Ministerio Público. E. L. Chiesa Aponte, Derecho Procesal Penal, 81 Rev. Jur. UPR 373, 380 (2012). El derecho al careo es un elemento esencial de un procedimiento criminal, pues genera fuertes indicios de confiabilidad y de justicia. Coy v. Iowa, 487 US 1012, 1018-1019 (1990).

Cónsono con ello, parte imprescindible del derecho al careo es la oportunidad de observar el comportamiento de las personas testigos y de adjudicar credibilidad a sus declaraciones. A esos fines, hemos resuelto que la importancia de un testimonio no solo recae en sus declaraciones, sino que además se trata de observar "las expresiones mímicas: el color de las mejillas, los ojos, el temblor o la consistencia de la voz, los movimientos, el vocabulario no habitual", entre otros elementos. Ortiz v. Cruz Pabón, 103 DPR 939, 947 (1975). Asimismo, hemos pautado que "la forma de hablar, el comportamiento, las explicaciones dadas, los gestos, ademanes

y demás detalles perceptibles con los sentidos resultan esenciales para aquilatar adecuadamente la sinceridad y credibilidad de los testimonios". Pueblo v. Torres Villafañe, 143 DPR 474, 488 (1997).

Ahora bien, hace varias décadas atrás, este Tribunal minimizó este primer aspecto del derecho a la confrontación. Particularmente, en Pueblo v. Ruiz Lebrón, 111 DPR 435 (1981), se resolvió que la confrontación garantizada por la Constitución de Puerto Rico "se cumple con la oportunidad de contrainterrogar, sin que sea indispensable la presencia del acusado. No está irremisiblemente atada al encuentro físico, al enfrentamiento nariz con nariz entre testigo y acusado". Íd., pág. 442. Así, razonó que el "[e]l principal y esencial propósito de la confrontación es asegurar al oponente la oportunidad de contrainterrogar". Íd. De esta manera, se menospreció la importancia del derecho al careo y se pautó que el derecho a contrainterrogar tenía más peso que la perima vertiente del derecho a la confrontación.

No obstante, más adelante, la Corte Suprema de los Estados Unidos **rescató el derecho al careo, reafirmó su valor esencial en un procedimiento criminal y dispuso que el mismo no se puede prescindir ligeramente**. Coy v. Iowa, supra, págs. 1018-1019, 1021. En esa ocasión, la Corte se enfrentó a un estatuto de Iowa que permitía a los menores de edad que presuntamente fuesen víctimas de delitos sexuales a testificar mediante videoconferencia. Lo anterior, bajo la presunción generalizada de que testificar ante la persona acusada de delito iba a ser traumático para la persona testificando.

A la luz de estos postulados, la Corte determinó que el estatuto en controversia violaba el derecho a la confrontación de la persona acusada. Íd., pág. 1020. En ese sentido, razonó que una presunción generalizada de que todo menor de edad sufrirá algún perjuicio en ese escenario no bastaba para justificar una limitación al derecho a la confrontación. Íd., pág. 1021.

En consecuencia, como puede apreciarse, la Corte Suprema de los Estados Unidos revocó indirectamente los pronunciamientos de este Tribunal en Pueblo v. Ruiz Lebrón, supra. En ese sentido, la premisa de que la vertiente del derecho al contrainterrogatorio tiene supremacía o más valor que el derecho al careo **no** tiene cabida en nuestro ordenamiento. Ciertamente, el derecho a contrainterrogar es un componente importante del derecho constitucional a la confrontación. Sin embargo, el hecho de que se le permita a la persona acusada a contrainterrogar a la persona testigo, no subsana automáticamente alguna limitación al derecho al careo. Para ello, hay que evaluar otras consideraciones. Precisamente, esa fue la tarea de la Corte Suprema de los Estados Unidos en Maryland v. Craig, 497 US 836 (1990). Veamos.

En este caso, la Corte resolvió que el derecho a la confrontación supone una preferencia por que la persona acusada se confronte cara a cara con los testigos de cargo. Íd., pág. 849. Sin embargo, razonó que los propósitos del derecho a la confrontación, que consisten en garantizar la confiabilidad del testimonio al someterlo a un escrutinio

riguroso, se pueden satisfacer **excepcionalmente** sin una confrontación cara a cara. Íd., págs. 845-850. A esos fines, interpretó que existen **circunstancias excepcionales y particulares** que ameritan que ceda la primera vertiente del derecho a la confrontación, el derecho al careo.

No obstante, tales excepciones no se reconocerán ligeramente. En ese sentido, el hecho de que "the face-to-face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with". (Énfasis suplido). Íd., pág. 850. Así, determinó que el derecho a la confrontación "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is **necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.**" (Énfasis suplido). Íd., pág. 850. Por tanto, se resolvió que se puede prescindir de una confrontación cara a cara entre la persona acusada y los testigos en su contra, siempre y cuando: (1) exista un interés u objetivo gubernamental apremiante que lo justifique, y (2) existan otros indicios que garanticen la confiabilidad del testimonio. Íd.; W. S. Santiago Mercado, Excepciones al derecho a la confrontación cara a cara del acusado, 85 Rev. Jur. UPR 267, 270 (2016).

Para determinar si las circunstancias particulares de la persona testigo ameritan que ésta no se confronte cara a cara con la persona acusada, los tribunales deben auscultar si ello es necesario para promover una política pública importante. Maryland v. Craig, supra. Para ello, se debe evaluar si el

interés apremiante del Estado es "sufficiently important to outweigh . . . a defendant's right to fase his or her accusers". Íd., pág. 853. De igual modo, se debe evaluar si el testimonio goza de otros elementos que garanticen su confiabilidad, como lo sería el juramento de la persona testigo, la oportunidad de contrainterrogar y la capacidad del jurado de apreciar el testimonio. Íd., págs. 845-846.

En virtud de estos fundamentos, la Corte validó un estatuto del estado de Maryland que disponía que ciertos menores de edad que eran víctimas de delitos sexuales podían testificar mediante un sistema electrónico de videoconferencia de una vía. Sin embargo, distinto al estatuto analizado en Coy v. Iowa, supra, el estatuto de Maryland disponía que había que realizar un análisis particular e individualizado de las circunstancias de cada caso con el objetivo de determinar si el bienestar del menor de edad exigía que éste testificara mediante videoconferencia. Maryland v. Craig, supra, págs. 855-856.

Ante esas circunstancias, la Corte determinó que tal estatuto era constitucional, pues razonó que la protección del bienestar de los menores de edad era un interés apremiante que justificaba tal limitación al derecho a la confrontación. Íd., pág. 855. Según la Corte, el sistema de transmisión de videoconferencia en controversia garantizaba adecuadamente la confiabilidad del testimonio mientras que preservaba la naturaleza adversativa del juicio. Íd., pág. 857.

A la luz de este precedente, tribunales federales y estatales de los Estados Unidos han reconocido otras circunstancias excepcionales que justifican que la persona acusada no confronte a la persona testigo cara a cara. A esos fines, se ha permitido que menores de edad, personas con enfermedades terminales o críticas, y personas extranjeras testifiquen en corte mediante sistemas de video conferencia. Horn v. Quaterman, 508 F.3d 306, 320 (5vo Cir. 2007); Harrell v. Butterworth, 251 F.3d 926, 931 (11mo Cir. 2001); United States v. Gigante, 166 F.3d 75, 81-82 (2do Cir. 1999); United States v. Weekley, 130 F.3d 747, 752-54 (6to Cir. 1997).

De hecho, en nuestro ordenamiento, las Reglas de Procedimiento Criminal disponen que tanto menores de edad como personas mayores de edad que padezcan de algún impedimento mental o que hayan sido víctimas de ciertos delitos, podrán testificar mediante un mecanismo de circuito cerrado. Regla 131.1 de Procedimiento Criminal, 34 LPRA Ap. II. Lo anterior, con la salvedad de que se celebrará una vista de necesidad para auscultar si el bienestar de la persona testigo exige testificar fuera de la presencia de la persona acusada.

Como puede apreciarse, la adopción de mecanismos o el reconocimiento de acciones que puedan ser lesivas al pleno ejercicio del derecho a la confrontación, en circunstancias excepcionales, no puede tomarse livianamente. El balance de intereses requiere explorar y promover la adopción de mecanismos menos onerosos a las garantías individuales, previo a adoptar la medida más drástica.

**II.**

Según expuesto, hoy una Mayoría de este Tribunal resuelve que las personas que testifiquen en un procedimiento criminal deberán declarar físicamente con una mascarilla en su rostro. Lo anterior, sin reconocer medios menos onerosos - tales como el testimonio a través de videoconferencia - que permitan ejercer un mejor balance entre proteger la salud de todos los participantes del proceso y salvaguardar, dentro de lo posible, los tres (3) corolarios del derecho a la confrontación. A la luz del cuestionable precedente de Pueblo v. Ruiz Lebrón, supra, la Opinión mayoritaria razona erradamente e ignorando el contenido mínimo exigido por la jurisprudencia de la Corte Suprema de los Estados Unidos, que el hecho de que la persona acusada tendrá derecho a contrainterrogar a la persona testigo subsana las limitaciones que conlleva el uso de la mascarilla. Discrepo en torno a ambas conclusiones.

El derecho de la persona acusada a carearse con los testigos en su contra es un componente esencial del derecho constitucional a la confrontación. El mismo es un garante de que los procedimientos criminales se celebren conforme a los postulados de la justicia y del debido proceso de ley. Debido a lo anterior, era imperativo que este Tribunal rectificara los pronunciamientos de Pueblo v. Ruiz Lebrón, supra, a la luz de la jurisprudencia federal.

Como expusimos anteriormente, este precedente local minimizó significativamente el derecho al careo y dispuso que

éste tenía menos peso que el derecho al contrainterrogatorio. Sin embargo, estos pronunciamientos **no** tienen vigencia en el ordenamiento penal puertorriqueño. Precisamente, en Coy v. Iowa, supra, y Maryland v. Craig, supra, la Corte Suprema de los Estados Unidos rescató el derecho al careo al catalogarlo como un elemento esencial del derecho a la confrontación.

Indudablemente, lo anterior constituye el estándar mínimo para nuestra jurisdicción. Por tal razón, es improcedente e incorrecto en derecho acudir a pronunciamientos locales anteriores que disponen protecciones menores a las contempladas federalmente. Debido a lo anterior, me veo impedido de suscribir los fundamentos expuestos en la Opinión mayoritaria.

Por otro lado, discrepo de la determinación de la Mayoría de imponer, de forma absoluta, que las personas testigos en procedimientos criminales declararán con mascarillas. Ciertamente, el interés de la Rama Judicial en evitar el contagio del COVID-19 en sus salas judiciales es legítimo y de suma importancia. No albergo duda de que la Rama Judicial, como rama de gobierno y como patrono, tiene un deber de implantar medidas salubristas que salvaguarden la salud de todas las personas presentes en un procedimiento criminal, incluyendo personal del Estado, abogados y abogadas, y las personas acusadas de delito.

En ese sentido, entiendo que permitir que una persona testifique sin mascarilla en una sala cerrada con otras personas presentes constituiría un riesgo significativo. Por

tanto, coincido en que nos encontramos ante una de esas circunstancias excepcionales y particulares contempladas en Maryland v. Craig, supra, pág. 850, que justifican una limitación al derecho a la confrontación, pues la misma es necesaria para promover la importante política pública de salvaguardar la salud de toda persona presente. Asimismo, coincido en que esta controversia no amerita un análisis individualizado y particularizado sobre el riesgo que representaría testificar sin mascarilla, pues la facilidad del contagio del COVID-19 es de conocimiento público.

No obstante, entiendo que la medida adoptada por una Mayoría de este Tribunal es innecesariamente onerosa y limita de manera más directa el derecho al careo. Según discutimos anteriormente, el derecho al careo conlleva necesariamente la oportunidad de observar y apreciar la totalidad de un testimonio. Eso incluye, pero no se limita, a gestos, expresiones faciales y el "demeanor" de la persona testigo. Por tanto, es innegable que el uso de una mascarilla limita significativamente el derecho a la confrontación de una persona acusada.

En consecuencia, entiendo que este Tribunal debió explorar otras alternativas, tales como el testimonio a través de videoconferencia, para salvaguardar y establecer un balance adecuado de los intereses en pugna. De esta manera, el derecho al careo de la persona acusada se ve menos afectado, pues se mantendría su facultad de percibir esos gestos faciales y expresiones que son tan vitales para la observación y la credibilidad de la persona testigo. De igual modo, esta medida

salvaguardaría la salud de las personas presentes, pues no los expondría a una persona testigo declarando sin mascarilla en un lugar cerrado.

Tal como resolvió la Corte Suprema en Maryland v. Craig, supra, el mecanismo de videoconferencia cuenta con otros indicios que confiabilidad, como lo son el juramento de la persona testigo, la oportunidad de contrainterrogar y la capacidad del jurado de apreciar el testimonio. Por tal razón, entiendo que el uso de la videoconferencia es una medida que garantiza adecuadamente la confiabilidad del testimonio mientras que preserva la naturaleza adversativa del juicio.

Es menester reconocer que, en este caso particular, la persona acusada se negó a celebrar el juicio mediante videoconferencia. Sin embargo, ello no es óbice para descartar el mecanismo de que las personas testigos puedan brindar su testimonio mediante videoconferencia. Es decir, el hecho de que la persona acusada no interese celebrar el juicio en su **totalidad** mediante videoconferencia no elimina automáticamente la alternativa de que las personas testigos sí declaren mediante videoconferencia. A fin de cuentas, es a este Tribunal al que le compete pautar los lineamientos del balance de intereses adecuado.

## III.

En fin, ante circunstancias excepcionales que ameriten alguna limitación al derecho al careo, este Tribunal debió auscultar medidas que intenten salvaguardar, lo más posible, los propósitos y objetivos del derecho a la confrontación. En

esa tarea, se debió abrir la puerta a medidas menos onerosas cuyos efectos no fuesen tan rampantes en contra del derecho al careo. En virtud de que hoy se pauta una norma que lacera innecesariamente el derecho a constitucional a la confrontación, respetuosamente disiento.


                                        Luis F. Estrella Martínez
                                              Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

      v.

Daniel Cruz Rosario

    Recurrido

CC-2020-250    *Certiorari*

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 25 de agosto de 2020.

En el día de hoy, esta Curia tiene la ineludible y delicada tarea de determinar cuál interés debe prevalecer cuando se enfrentan los derechos de los acusados -- tales como el debido proceso de ley, el derecho a confrontar y contrainterrogar a los testigos de cargo, el derecho a una representación legal adecuada, así como a un juicio justo e imparcial -- con la salud y seguridad de un Pueblo que sufre los estragos ocasionados por la pandemia del COVID-19. Ello, en el contexto del uso de mascarillas por parte de los testigos de cargo en determinado proceso criminal, ante la negativa del acusado de delito de utilizar el mecanismo de videoconferencia para la celebración de un juicio por delito menos grave.

Aun cuando entendemos que estamos viviendo una situación sin precedentes, que trastoca y pone en riesgo a todos los puertorriqueños y puertorriqueñas, -- contrario a lo que hoy resuelve una mayoría del Tribunal --, somos de la opinión que, en casos como el que nos ocupa, el uso de mascarillas por parte de los testigos de cargo lesiona el derecho al careo que le asiste a todo acusado de delito. No obstante, sí entendemos que tales derechos bien pudieron salvaguardarse mediante la celebración de los procedimientos aquí en controversia a través de los mecanismos de videoconferencia, de forma obligatoria.

Aclaramos, sin embargo, que la procedencia de dicho mecanismo -- entiéndase, el uso de los sistemas de videoconferencias -- debe limitarse al periodo en que esté vigente el actual estado de emergencia de salud pública. Finalizada la misma, procede que se restauren **inmediatamente** todas las garantías constitucionales que cobijan a los acusados en lo relacionado a la presencia física de éstos en corte. Veamos.

I.

Los hechos medulares que dieron margen al presente litigio se recogen con particular precisión en la Opinión que hoy emite este Tribunal, por lo que acogemos los mismos por referencia. En síntesis, el caso de marras versa sobre el uso de mascarillas por parte de los testigos de cargo mientras éstos declaran en determinado

proceso criminal, ante la negativa del acusado de delito de utilizar el mecanismo de videoconferencia para la celebración de un juicio en su contra, por la comisión de un delito menos grave. Lo anterior, con el fin de cumplir con algunas de las medidas recomendadas por las entidades de salud pertinentes -- tales como la Organización Mundial de la Salud (en adelante, "OMS") y el Centro para el Control y la Prevención de Enfermedades (en adelante, "CDC") -- para contrarrestar el avance de la pandemia COVID-19.

Por un lado, el señor Daniel Cruz Rosario (en adelante, "señor Cruz Rosario") aduce que lo anterior viola su derecho constitucional a la confrontación, así como el debido proceso de ley. Ello, pues, sostiene que la cláusula de confrontación dispuesta en nuestra Constitución -- en específico, el derecho al careo recogido en la misma -- requiere que los testigos que van a testificar en contra de una parte lo hagan en presencia de dicha parte, es decir, cara a cara. Asimismo, arguye que las mencionadas prácticas violan su debido proceso de ley, pues el rostro tapado de un testigo mediante una mascarilla le impide al juzgador aquilatar la credibilidad del mismo, así como garantizarle un juicio justo e imparcial. Este argumento no fue acogido por el Tribunal de Primera Instancia, pero sí por el Tribunal de Apelaciones.

Así las cosas, el Ministerio Público acude ante esta Curia y aduce que, si bien el careo es preferible, el mismo no es absoluto, por lo que puede ser obviado por consideraciones de política pública y necesidad. Sostiene que el uso de mascarillas -- lo cual es una herramienta importante para disminuir el riesgo de contagiarse con COVID-19 -- es suficiente justificación para que en medio de un juicio se pueda limitar el derecho de ver la boca y la nariz del testigo mientras declara. Más aún, cuando el mismo estará presente en sala, bajo juramento y sujeto a contrainterrogatorio.

Por lo anterior, nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Apelaciones el 3 de julio de 2020. En la misma, el foro apelativo intermedio concluyó que el juicio en su fondo en contra del señor Cruz Rosario -- por el delito menos grave de intrusión en la tranquilidad personal (Art. 178 del Código Penal de 2012, 33 LPRA sec. 5244) -- debía celebrarse de manera presencial y sin el uso de mascarilla por los testigos de cargo mientras declararan. El señor Cruz Rosario se opuso a dicha solicitud.

Trabada así la controversia, y con el beneficio de la comparecencia de ambas partes, procedemos a exponer la normativa aplicable a la misma.

II.

Como es sabido, el Art. II, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico dispone que "[e]n todos los procesos criminales el acusado disfrutará del derecho a un juicio rápido y público ... a carearse con los testigos de cargo, a obtener la comparecencia compulsoria de testigos a su favor, a tener asistencia de abogado, y a gozar de la presunción de inocencia". CONST. ELA art. II, § 11, LPRA, Tomo 1. De igual manera, la Enmienda Sexta de la Constitución de Estados Unidos establece, en lo pertinente, que el acusado disfrutará del derecho a confrontar a los testigos que se presenten en su contra. CONST EE.UU. enm. VI, LPRA, Tomo. 1. En *Pueblo v. Bussman*, 108 DPR 444 (1979), este Tribunal expresó que, conforme a la precitada sección, "[t]odo acusado tiene derecho a estar presente en todas las etapas del juicio. Es un principio fundamental que no se cuestiona". Véanse además, *Toro Rivera v. ELA*, 194 DPR 393 (2015); *Pueblo v. Lourido Pérez*, 115 DPR 798 (1984).

Ahora bien, al respecto, nos señala el profesor Ernesto L. Chiesa Aponte que no hay un derecho absoluto a estar presente en todo incidente del procedimiento criminal. Lo anterior, pues ello se refiere al juicio, en específico, en relación con las siguientes etapas o incidencias: (1) testimonio de testigos en contra del acusado, ello como exigencia de la cláusula de confrontación; (2) presentación de prueba testifical,

documental, demostrativa o de cualquier índole, como corolario del debido proceso de ley y del derecho a asistencia de abogado; y (3) cualquier incidente donde la ausencia involuntaria del acusado menoscabe significativamente la defensa de éste o resulte contraria a la noción de juicio justo e imparcial lo cual es exigencia del debido proceso de ley. E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Bogotá, Editorial Forum, Vol. II, pág. 237 (1992).

En esa dirección, cabe mencionar que, si bien el derecho del acusado a estar presente en el juicio es una exigencia del debido proceso de ley, el mismo no es absoluto. *Pueblo v Esquilín Díaz*, 146 DPR 808, 822-23 (1998); *Pueblo v. Bussman*, *supra*, pág. 446. Consecuentemente, tanto este Tribunal como la Corte Suprema de Estados Unidos han validado la renuncia a este derecho. *Íd; Pueblo v. Ruiz Lebrón*, 111 DPR 435, 444 (1981); *Pueblo v. Bussman*, *supra*, págs. 446-47. En lo relativo a la doctrina de renuncia al derecho a estar presente en el juicio -- lo cual generalmente aplicaría también al momento en que se dicte sentencia -- la misma puede ser implícita o explícita. Véase, Chiesa Aponte, *op. cit.,* pág. 260

En ese sentido, procede resaltar que las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, reconocen una mayor jerarquía a este derecho cuando se trata de delitos

graves. Chiesa Aponte, *op. cit.*, págs. 258-59. Al respecto, la Regla 243 (a) dispone que "[e]n todo proceso por delito grave (felony) el acusado deberá estar presente en el acto de la lectura de la acusación y en todas las etapas del juicio, incluyendo la constitución del jurado y la rendición del veredicto o fallo, y en el pronunciamiento de la sentencia". Si el acusado compareció al acto de lectura, y fue advertido y citado para juicio pero no se presenta, el tribunal podrá celebrar el mismo en ausencia de éste, siempre que estuviese representado por abogado. 34 LPRA Ap. II, R. 243(a). Véase, *Pueblo v Esquilín Díaz*, *supra*, págs. 822-23.

Mientras, en casos por delitos menos graves, -- como el que hoy nos ocupa --, siempre que el acusado estuviere representado por abogado, el tribunal podrá proceder a la lectura de la denuncia o acusación, al juicio, al fallo y al pronunciamiento de la sentencia, y podrá recibir una alegación de culpabilidad en ausencia de éste. Si la presencia del acusado fuera necesaria, el tribunal podrá ordenar su asistencia. 34 LPRA Ap. II, R. 243 (b).

Asimismo, el inciso (d) de la precitada regla contempla cierta conducta del acusado como una renuncia a su derecho a estar presente en los procedimientos. Ello, al disponer que, en procesos por delitos graves o menos

graves, si el acusado incurre en cualquier conducta que impida el desarrollo normal del juicio, el tribunal podrá: (1) tramitar un desacato; (2) tomar las medidas coercitivas pertinentes; o (3) ordenar que el acusado sea removido y continuar con el proceso en su ausencia. 34 LPRA Ap. II, R. 243 (d).

No empece lo anterior, el hecho de que pueda renunciarse al derecho a estar presente no implica que deba fomentarse esa práctica. *Pueblo v. Bussman*, *supra*, pág. 447. "Es preferible la presencia del acusado durante todas las etapas del proceso y solamente debe dispensarse de ella en casos en que se demuestre que resultaría extremadamente gravosa su comparecencia, que el estado no la requiera para establecer su caso y que su ausencia no demorará los procedimientos". *Torres Rosario v. Alcaide*, 133 DPR 707 (1993); *Pueblo v. Bussman*, *supra*.

III.

Por otra parte, la precitada disposición constitucional también hace referencia a lo que la jurisprudencia ha reconocido como la "cláusula de confrontación", la cual recoge *el derecho de un acusado a confrontar a sus acusadores y se compone de tres aspectos fundamentales*. *Pueblo v. Pérez Santos*, 195 DPR 262, 26970 (2016); *Pueblo v. Santos Santos*, 185 DPR 709, 720 (2012). En primer lugar, todo acusado tiene derecho al careo o confrontación *cara a cara* con los testigos adversos. En

segundo lugar, tienen derecho a contrainterrogar a estos testigos. Finalmente, la referida cláusula contempla el derecho a que se excluya cierta prueba de referencia que el Ministerio Público pretenda utilizar como prueba de cargo. *Íd.* Véase, Chiesa Aponte, *op. cit.,* pág. 569.

El primer corolario de la referida cláusula constitucional es el *careo* lo cual hace referencia a que los testigos de cargo testifiquen frente al acusado, cara a cara.[41] Dicho aspecto contribuye significativamente a la búsqueda de la verdad y a un juicio justo. Véase, *Coy v. Iowa*, 487 US 1012 (1988). Véase además, E.L. Chiesa Aponte, *Procedimiento Criminal y Constitucional: Etapa Adjudicativa*, Ed. Situm, 2018, págs. 82-83. "Su fundamento es muy sencillo: es más fácil decir algo contra una persona cuando esta no está presente; es más difícil hacerlo de frente". Ernesto L. Chiesa Aponte, *Derecho Procesal Penal*, 81 Rev. Jur UPR 373, 380 (2012).

Sobre el particular, esta Curia ha expresado que para que la confrontación o *careo* tenga concreción, el

---

[41] Ahora bien, a *contrario sensu*, en *Pueblo v. Ruiz Lebrón*, 111 DPR 435 (1981), este tribunal sentenció que la confrontación que garantiza la Sexta Enmienda y el Art. II, Sec. 11 de nuestra Constitución se cumple con la oportunidad de contrainterrogar, sin que sea indispensable la presencia del acusado. Lo anterior, tras expresar que la confrontación no está irremisiblemente atada al encuentro físico, al enfrentamiento nariz con nariz entre testigo y acusado. Sin embargo, la Corte Suprema de los Estados Unidos rescató este aspecto de la cláusula de confrontación en *Coy v. Iowa*, 487 US 1012 (1988), en el cual declaró inconstitucional un estatuto de Iowa que permitía, para la protección de cierto tipo de testigo de cargo, testificar sin mirar al acusado, a través de una pantalla, sin necesidad de que el Ministerio Público justificara la necesidad de prescindir del careo. Véase, Ernesto L. Chiesa Aponte, *Derecho Procesal Penal*, 81 Rev. Jur. UPR 373 (2012).

debido proceso de ley exige que se pongan al alcance del acusado los medios de prueba para impugnar los testigos y atacar su credibilidad, así como todo recurso análogo dirigido a erradicar la falsedad del juicio. *Pueblo v. Guerrido López*, 179 DPR 950, 958 (2010); *Pueblo v. Casanova*, 161 DPR 183, 192 (2004); *Pueblo v. Rodríguez Sánchez*, 109 DPR 243 (1979). "Un careo sin estos instrumentos, cuando sean legítimamente asequibles, frustra el propósito del precepto constitucional". *Íd. Pueblo v. Guerrido López*, *supra.*

Como segundo corolario, y núcleo de la cláusula de confrontación, tenemos el derecho de los acusados de contrainterrogar a los testigos que el Ministerio Público presente en su contra. Al respecto, hemos sentenciado que el derecho a contrainterrogar un testigo es imprescindible para la celebración de un juicio justo e imparcial pues éste es el mecanismo con el que cuenta la defensa para descubrir la verdad. *Pueblo v. Guerrido López*, *supra*, pág. 958; *Pueblo v. Pacheco Padilla*, 92 DPR 894, 897 (1965). De lo anterior, podemos colegir que el acusado debe estar presente durante el testimonio de estos testigos en el juicio. Consecuentemente, parte esencial del derecho a la confrontación es la presencia física del acusado. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, *op. cit.*, págs. 233-234.

En tercer lugar, la disposición constitucional exige que se excluya cierta prueba de referencia como prueba de cargo, entiéndase aquella declaración que no sea la que la persona declarante hace en el juicio o vista, la cual se ofrece en evidencia para probar la verdad de lo aseverado. 32 LPRA Ap. R. 801. Al respecto, e interpretando su análoga en la Enmienda Sexta, en *Crawford v. Washington*, 541 US 36 (2004), la Corte Suprema de Estados Unidos concluyó que sólo se permite la admisión en evidencia de una declaración testimonial hecha contra un acusado fuera de corte si el declarante no está disponible para comparecer al juicio y el acusado tuvo la oportunidad de contrainterrogarlo en el momento en que se hizo la declaración. De no satisfacerse estos requisitos, la declaración sería prueba de referencia inadmisible contra el acusado, independientemente de que satisfaga alguna excepción de aquellas dispuestas en las Reglas de Evidencia. Véase, *Pueblo v. Santos Santos*, *supra*, pág. 721.

Consecuentemente, *Crawford v. Washington*, *supra*, aclara que, más que garantizar la confiabilidad de la evidencia, la cláusula de confrontación exige que dicha confiabilidad sea evaluada mediante el mecanismo del contrainterrogatorio.[42] *Crawford v. Washington*, *supra*,

---

[42] En *Pueblo v. Santos Santos*, *supra*, aclaramos que, conforme a lo resuelto en *Pueblo v. Guerrido López*, *supra*, *Crawford* y su progenie constituyen jurisprudencia normativa para nuestra jurisdicción.

pág. 61. "Se trata, pues, de una garantía procesal a favor del acusado que no es susceptible de evasión a conveniencia del Estado". *Pueblo v. Santos Santos*, *supra*, págs. 721-22.

**Por otra parte, es menester señalar que el comportamiento del testigo, su forma de hablar, los gestos, ademanes y demás detalles perceptibles con los sentidos, así como las explicaciones dadas por éste durante el contrainterrogatorio, son herramientas esenciales para aquilatar adecuadamente la credibilidad de los testimonios.** *Pueblo v. Chévere Heredia*, 139 DPR 1, 16 (1995); *Pueblo v. Rivera Ramos*, 11 DPR 858 (1988). **Consecuentemente, el juzgador de los hechos ante quien deponen los testigos debe tener la oportunidad de observar el *demeanor* de éstos para determinar si dicen la verdad.** *Pueblo v. García Colón I*, 182 DPR 129, 165 (2011).

**Cónsono con lo anterior, este Tribunal ha expresado que "el testigo debe ser oído, y visto, interrogado y mirado".** *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1975). **Por ello, no solo es importante la voz de éste, sino también otras expresiones tales como el color de las**

---

"Claro está, las interpretaciones que la Corte Suprema realice sobre la cláusula de confrontación federal, así como de cualquier otro derecho aplicable a nuestra jurisdicción, representan meramente el mínimo obligados a reconocer bajo nuestra propia Constitución, sin impedimento alguno de interpretar más ampliamente derechos cobijados bajo la factura más ancha de nuestra Constitución moderna". *Pueblo v. Santos Santos*, *supra*, pág. 725.

**mejillas, los ojos, la consistencia o temblor de la voz, los movimientos corporales y el vocabulario no habitual del testigo.** *Íd.*

Ahora bien, conviene reseñar aquí lo resuelto por la Corte Suprema de Estados Unidos en *Maryland v. Craig*, 497 US 836 (1990). En dicho caso, se sostuvo la constitucionalidad de un estatuto del estado de Maryland que permitía que un menor -- víctima de abuso sexual -- testificara mediante el sistema electrónico de una vía, siempre y cuando se realizaran determinaciones específicas sobre el daño emocional que podría sufrir al ser llamado a testificar frente al acusado.

Allí, el foro federal expresó que la cláusula de confrontación de la Enmienda Sexta no garantiza un derecho absoluto a la confrontación cara a cara con el testigo. Dicho foro razonó que el propósito central de la cláusula es asegurar la confiabilidad de la evidencia presentada en contra del acusado, lo cual se logra con los siguientes elementos: (1) presencia física; (2) juramento del testigo; (3) contrainterrogatorio; y (4) observación del comportamiento o *demeanor* del testigo por parte del juzgador.

No obstante lo anterior, sostuvo que, aunque el careo es un aspecto importante de la referida cláusula, ello no es un elemento indispensable del derecho a la confrontación. *Maryland v. Craig*, *supra*, pág. 846. Por

ello, expresó que **el derecho de confrontar a los testigos adversos puede satisfacerse en ausencia de una confrontación física o careo en el juicio solo cuando ello sea necesario para <u>adelantar una política pública importante y cuando se asegure la confiabilidad del testimonio del que se trate</u>**. *Íd*, en la pág. 850.

Consecuentemente, se requiere realizar un balance de intereses entre el interés que el Estado pretende proteger *vis a vis* el derecho de los acusados a la confrontación. Es decir, el interés del Estado debe ser lo suficientemente apremiante y necesario para justificar el uso de un procedimiento especial, tal como sería el uso de mascarillas por parte de los testigos de cargo o, en la alternativa, un sistema de videoconferencias.

IV.

De otra parte, el Art. II, Sección 11 de nuestra Constitución también hace referencia al derecho a tener representación legal en casos criminales. CONST. ELA art. II, § 11, LPRA, Tomo 1. Además, éste se ha consagrado como parte fundamental de la cláusula del debido proceso de ley. *Ramos Acevedo v. Tribunal Superior,* 133 DPR 599, 609 (1993); *Pueblo v. Ortiz Couvertier,* 132 DPR 883, 887 (1993). Para que se configure, el derecho constitucional a la asistencia de abogado debe ser uno adecuado y efectivo. *Íd*. Lo anterior puede quedar menoscabado

cuando: (1) el abogado es incompetente para la tarea que se le asigna; (2) como cuestión de hecho la labor desplegada demuestra su inefectividad; (3) hay un potencial o actual conflicto de intereses para el abogado; y (4) las reglas o actuaciones del tribunal constituyen una limitación irrazonable al derecho a tener adecuada asistencia de abogado. *Pueblo v. Ortiz Couvertier, supra,* pág. 88, (citando a E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 7.9, págs. 449-550). Debido a su fundamental importancia en nuestro ordenamiento penal, la Regla 192.1 de Procedimiento Criminal permite que un convicto invoque como fundamento contra su sentencia que éste no recibió una representación legal adecuada. 34 LPRA Ap. II, R. 192.1.

Asimismo, nuestra Carta Magna le garantiza a toda persona imputada o acusada de delito el derecho a un juicio justo e imparcial en el cual se le brinden todas las salvaguardas que provee el debido proceso de ley. De lesionarse estos derechos fundamentales, "se quebrantan valores esenciales de nuestra sociedad y se atenta directamente contra la libertad individual". *Pueblo v. Rodríguez*, 193 DPR 987, 994 (2015).

No obstante, este Tribunal ha resuelto que no solo el imputado de delito tiene derecho a un juicio justo e imparcial. *Pueblo v. Esparra Álvarez*, 196 DPR 659, 670

(2016). Al Estado también le cobija la referida garantía ya que éste representa los intereses de la ciudadanía en los procesos penales. *Íd; Pueblo v. Hernández Santana*, 138 DPR 577, 584 (1995). Por ende, al igual que el imputado, el Estado tampoco puede quedar desprovisto de un juicio justo e imparcial. *Pueblo v. Esparra Álvarez, supra*.

V.

Por último, y como se sabe, en diciembre de 2019 surgió una nueva enfermedad infecciosa conocida como COVID-19, perteneciente a una extensa familia de virus llamados coronavirus. El mismo causa infecciones respiratorias que van desde un resfriado común hasta enfermedades más graves como el síndrome respiratorio de Oriente Medio (MERS) y el síndrome respiratorio agudo severo (SARS). Además, entre los síntomas más habituales se encuentran la fiebre, tos seca, el cansancio y, en ocasiones, congestión nasal, dolor de cabeza, conjuntivitis, entre otros.[43]

Según la OMS, alrededor de una de cada cinco (5) personas que contraen COVID-19 presentan un cuadro grave y experimentan dificultades para respirar. Esta situación se agrava cuando se trata de personas mayores y aquellas

---

[43] Organización Mundial de la Salud, *Preguntas y respuestas sobre la enfermedad por coronavirus* (COVID-19), https://www.who.int/es/emergencies/diseases/novel-coronavirus-2019/advice-for-public/q-a-coronaviruses (última visita 31 de julio de 2020)

que padecen de condiciones médicas previas como hipertensión arterial, problemas cardiacos o pulmonares, diabetes o cáncer. No obstante, aclaran que cualquier persona puede contraer el virus y enfermarse gravemente. Asimismo, es posible que alguien se haya contagiado con el virus pero no presente síntomas por lo que puede infectar a otros sin siquiera saberlo.[44]

En esa dirección, la principal forma de propagación del COVID-19 es a través de las gotículas respiratorias expelidas cuando alguien enfermo toce, estornuda o habla. De esa manera, una persona puede contraer la enfermedad por contacto con otra persona que esté infectada e inhale dichas gotículas. Además, las mismas pueden caer sobre objetos y superficies por lo que otras personas pueden infectarse si luego de tocar dichas superficies, se tocan los ojos, nariz o boca sin lavar o desinfectar sus manos.

Por tanto, debido a la facilidad con que se ha ido propagando el virus, el 11 de marzo de 2020 la OMS declaró el COVID-19 una pandemia, es decir, una propagación mundial de una nueva enfermedad.[45] Según la referida Organización, a 16 de agosto de 2020, a nivel global 21,294,845 de personas se ha infectado con el

---

[44] *Íd.*

[45] Para una línea del tiempo sobre el desarrollo del COVID-19 a nivel mundial, Véase, World Health Organization, *WHO's COVID-19 response,* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline#event-71 (última visita 20 de agosto de 2020).

virus y 761,779 personas de dicha suma han fallecido. Por su parte, Puerto Rico registra un total de 25,695 casos -- entre casos probables y casos confirmados -- con 329 muertes.[46]

No empece a ello, existen varias maneras de protegernos y prevenir la propagación de la enfermedad. Entre ellas, se recomienda el lavado frecuente de manos con agua y jabón o con un desinfectante a base de alcohol y evitar tocarse los ojos, nariz y boca. Además, al salir de la casa, se debe utilizar una mascarilla que cubra la boca y nariz. Asimismo, se recomienda evitar ir a lugares concurridos y practicar el distanciamiento social debido a que cuando hay aglomeración de personas, existe mayor probabilidad de entrar en contacto con alguien que porta el virus.[47]

Como consecuencia de la gravedad y fácil propagación del mencionado virus, no solo se ha afectado la vida cotidiana de los individuos, sino la manera en que se conducen y realizan los procedimientos en todas las instituciones de un país, entre ellas -- y en lo pertinente -- la Rama Judicial. Por esta razón, y con el fin de proveer seguridad y estabilidad en momentos de crisis como los que enfrentamos con la pandemia del

---

[46] Véase, World Health Organization, *Coronavirus disease* (COVID-19) *Situation Report-196,* 16 de agosto de 2020, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports

[47] Organización Mundial de la Salud, *Preguntas y respuestas sobre la enfermedad por coronavirus* (COVID-19), *supra*, nota 3.

COVID-19, los tribunales han reducido sustancialmente la plantilla de empleados que trabajen de forma presencial y han adoptado diversas medidas que a su vez garantizan la salud de todos los funcionarios, así como de la ciudadanía en general.

Entre dichos mecanismos se encuentra el sistema de videoconferencias como una alternativa para atender de forma remota aquellos asuntos urgentes que se presenten durante el actual estado de emergencia. Tanto en Puerto Rico como en Estados Unidos se ha fomentado su uso pues "[v]irtual proceedings are the best way to maintain social distancing to reduce the spread of COVID-19 and ensure the continued administration of justice through the duration of the crisis".[48]

Sobre el particular, específicamente en cuanto al uso de la plataforma Zoom, la Jueza de Distrito Emily Miskel -- quien el 18 de mayo de 2020 presidió el primer juicio por jurado celebrado de manera remota -- reconoce las ventajas de utilizar dicha herramienta. En ese sentido, la Jueza entiende que poder observar al testigo de frente, y no uno de sus lados, mejora la tarea principal del juzgador de hechos, entiéndase, aquilatar credibilidad. "In a real courtroom, they're sitting

---

[48] Véase, National center for State Courts, *State court judges embrace virtual hearings as part of the 'new normal'.* https://www.ncsc.org/newsroom/public-health-emergency/newsletters/videoconferencing (última visita 3 de agosto de 2020)

sideways to the witness and the witness may be 20 feet away, whereas on Zoom, the witness is right up close to them".[49]

A tenor con lo anterior, la Oficina de Administración de los Tribunales promulgó las *Guías Generales para el Uso del Sistema de Videoconferencia en los Tribunales del Estado Libre Asociado de Puerto Rico y las Guías sobre las disposiciones generales para el uso de la videoconferencia en los procedimientos penales*.[50] En ellas se esboza el proceso mediante el cual se podrán atender a través de la videoconferencia, asuntos de lo penal, tales como, pero sin limitarse a: lectura de acusación, procedimientos interlocutorios, vistas sobre el estado de los procedimientos, alegaciones preacordadas, imposición de sentencia, vistas de seguimiento, vistas de revocación de probatoria y vistas de archivo. Ello, pues se ha comprobado que el uso de tal mecanismo garantiza el acceso de los ciudadanos y las ciudadanas a los tribunales, promueve los intereses de la

---

[49] Véase, National Center for State Courts, *Stories from Inside the Courts: Judge Emily Miskel*, https://www.ncsc.org/newsroom/public-health-emergency/newsletters/from-inside-the-courts/judge-emily-miskel (última visita 31 de julio de 2020).

[50] Véase, Oficina de Administración de los Tribunales, *Guías Generales para el uso del Sistema de Videoconferencia en los Tribunales del Estado Libre Asociado de Puerto Rico,* http://www.ramajudicial.pr/medidas-cautelares/Guias-Generales-Videoconferencia-2020.pdf (última visita 3 de agosto de 2020).

Véase, además, *Guías sobre las disposiciones generales para el uso de la videoconferencia en los procedimientos penales.* http://www.ramajudicial.pr/medidas-cautelares/Guias-Videoconferencia-Casos-Penales.pdf (última visita 3 de agosto de 2020).

justicia y permite adelantar los procesos judiciales mientras esté vigente la emergencia de salud.

Es, pues, a la luz de la normativa antes expuesta que procedemos a disponer de las controversias ante nuestra consideración.

VI.

Así pues, y de conformidad con la normativa antes esbozada, somos de la opinión que en los procesos criminales -- en situaciones normales de un País -- nada sustituye la presencia física de los imputados o acusados en los procedimientos que se llevan en su contra. Así lo exige la Constitución del Estados Libre Asociado de Puerto Rico y la Constitución de los Estados Unidos de América, y así se ha interpretado en la jurisprudencia de este Tribunal y del Tribunal Supremo de los Estados Unidos.

No obstante, ante una situación en extremo complicada y preocupante, tal como la crisis de salud que vivimos ocasionada por la pandemia del COVID-19, la conciencia -- y no una interpretación textualista del Derecho -- nos llevan a tomar medidas, en cierto grado drásticas, con el fin de velar por el derecho a la vida y salud de los puertorriqueños y puertorriqueñas. Derechos que, a su vez, se encuentran garantizados por el Art. II, Sec. 7, de nuestra Carta Magna.

En ese sentido, procede realizar un balance de intereses entre la salud y el bienestar de nuestro Pueblo y el derecho de los acusados, en específico, aquellos garantizados por la cláusula de confrontación y el debido proceso de ley. Realizado dicho análisis, la balanza de intereses se inclina a favor de asegurar la salud y bienestar del Pueblo, empleando alternativas novedosas que, a su vez, garanticen los derechos de los acusados que enfrentan un proceso criminal. El uso de mascarillas por parte de los testigos de cargo no es una opción, no al menos para quien suscribe.

Y es que, ante la preocupación de que el uso de mascarillas por parte de un testigo de cargo incida sobre el derecho a la confrontación que cobija a todo acusado de delito, -- preocupación que compartimos, pues a todas luces su uso impide que los jueces y abogados de las partes puedan apreciar adecuadamente el *demeanor* de los testigos en todo proceso criminal --, es menester considerar la alternativa de celebrar las vistas mediante el mecanismo de videoconferencia, alternativa que fue descartada por el señor Cruz Rosario. Claro está, para ello es necesario que se viabilice el uso efectivo de esta herramienta tecnológica de forma tal que no se menoscaben los derechos de los acusados.

Entre las medidas para viabilizar el uso efectivo de los sistemas de videoconferencias, el tribunal puede

exigir que todos los participantes tengan una conexión única y separada a la videoconferencia. Es decir, tanto el Juez o Jueza, como el fiscal, el abogado de defensa, el acusado y los testigos, deben comparecer a la vista por videoconferencia desde una computadora o dispositivo independiente, con su propia cámara y monitor que sirva únicamente a ese participante. Además, el Juez o Jueza deberá advertirles a todos y todas que aun cuando la vista se está celebrando por videoconferencia, aplicarán las mismas formalidades y exigencias que en las vistas celebradas en la sala del Tribunal.

En cuanto a los testigos, éstos podrían ser ubicados en algunos de los salones de medios o de videoconferencia que han sido habilitados en los centros judiciales para esos propósitos. Incluso, el Tribunal puede instruir al alguacil a supervisar al testigo durante su testimonio y mientras se encuentre esperando su turno para declarar. También, se pueden instruir a estos testigos -- so pena de desacato -- que durante el transcurso del procedimiento no deberán tener consigo dispositivos electrónicos, tales como teléfonos celulares, ni podrán comunicarse ni recibir mensajes o instrucciones de otras personas ajenas al Tribunal. Asimismo, a estos últimos se les puede requerir que muevan su cámara de manera tal que las partes puedan inspecciones el lugar desde donde éstos se encuentran y el Juez o Jueza imparta las instrucciones

que entienda necesarias para asegurar la pureza de los procedimientos.

Por otro lado, del acusado encontrarse recluido en una institución penal, el Juez o Jueza de instancia puede ordenar que se habilite un salón de conferencia privado dentro de la videoconferencia (los llamados "breakout rooms"), de modo que el abogado y su cliente puedan comunicarse en cualquier momento, tal como lo harían presencialmente. Tan pronto el acusado o su abogado levanten la mano o expresen su interés de conferencia, el Juez o Jueza detendrá la vista y los referirá al salón de conferencia privado. De igual manera, estos salones pueden utilizarse por el fiscal y el abogado de defensa para discutir posibles estipulaciones, así como para compartir y mostrar la prueba documental previo a su presentación formal ante el Tribunal conforme a las Reglas de Evidencia.

Por último, conforme a las *Guías* antes mencionadas, el Tribunal deberá instruir a todos los participantes del proceso que, si en algún momento se enfrenta alguna dificultad técnica, se detendrá la vista y se recesará hasta tanto se pueda restablecer la comunicación. En caso de que no se pueda reestablecer la conexión o comunicación, se suspenderán los procedimientos hasta

tanto éstos puedan celebrarse de forma efectiva, ya sea mediante videoconferencia o presencialmente.[51]

**En fin, como hemos podido apreciar, la forma más razonable de lograr un balance adecuado entre los intereses aquí en controversia es mediante el <u>uso obligatorio</u> de los sistemas de video conferencias en el proceso judicial que nos ocupa. Sin embargo, aclaramos que para que este mecanismo proceda es un requisito *sine qua non* que se establezca la confiabilidad del testimonio. Para ello, el tribunal debe asegurarse de tomar el juramento a los testigos, que el acusado y su representación legal tengan oportunidad de contrainterrogar a los testigos de cargo y que, mientras estos últimos testifiquen, tanto la defensa como el juzgador puedan observarlos. Asimismo, deben salvaguardarse todas aquellas garantías que dispone nuestra Constitución y asegurar el cumplimiento con las Reglas de Procedimiento Criminal, así como la Reglas de Evidencia.**

No empece lo anterior, repetimos, el curso de acción antes descrito solo debe tener efecto mientras esté vigente la emergencia ocasionada por la pandemia. Finalizada la misma, procede que se restauren <u>inmediatamente</u> todas las garantías constitucionales que cobijan a los acusados en lo relacionado a la presencia

---

[51] Véase, *Guías sobre las disposiciones generales para el uso de la videoconferencia en los procedimientos penales*, *supra*, nota 10*.*

física de éstos en corte. En momentos tan inciertos y difíciles, prestamos nuestro voto para permitir el acceso a la justicia velando, a su vez, por la salud y vida de todos los puertorriqueños y puertorriqueñas.

Es, pues, por todo lo anterior, que disentimos del resultado al que llega esta Curia en el día de hoy.


Ángel Colón Pérez
Juez Asociado